FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| RICHARD LOUIS ARNOLD PHILLIPS, *Petitioner-Appellant,* v. STEVEN W. ORNOSKI, *Respondent-Appellee.* | No. 04-99005 D.C. No. CV-F-92-05167-REC ORDER AMENDING OPINION, AND DENYING REHEARING AND REHEARING EN BANC AND AMENDED OPINION |

Appeal from the United States District Court
for the Eastern District of California
Robert E. Coyle, Senior District Judge, Presiding

Argued and Submitted
March 25, 2009—San Francisco, California
Withdrawn from Submission July 1, 2010
Resubmitted August 31, 2011

Filed March 16, 2012
Amended May 25, 2012

Before: Betty B. Fletcher, Stephen Reinhardt, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Reinhardt;
Partial Concurrence and Partial Dissent by Judge Kleinfeld

5771

PHILLIPS v. ORNOSKI                    5777

## COUNSEL

Richard Phillips, San Quentin, California, appearing *pro se*;
Katherine L. Hart, Fresno, California, advisory counsel, for
the petitioner-appellant.

Catherine Chatman, Supervising Deputy Attorney General,
Sacramento, California; Robert Todd Marshall, Assistant
Attorney General, Sacramento, California, for the respondent-
appellee.

## ORDER

The majority opinion filed March 16, 2012, slip op. 3155,
and appearing at 673 F.3d 1168 (9th Cir. 2012), is hereby
amended as follows:

5778                          PHILLIPS v. ORNOSKI

1.  slip op. at 3163, lines 4-5: replace "vacate the jury's spe-
    cial circumstance finding that rendered Phillips death-
    eligible," with "reverse and remand with instructions to
    grant the writ as to the jury's special circumstance find-
    ing,"

2.  slip op. at 3186-87, n.10, lines 29-30: delete "disclose the
    existence of the deal to Phillips, or whether it had the
    duty to"

3.  slip op. at 3209, lines 12-13: replace "We therefore
    vacate that finding." with "That finding must therefore be
    vacated." and replace "We also vacate the death penalty
    sentence" with "So, too, must the death penalty sentence"

4.  slip op. at 3209, line 29 – slip op. at 3210, line 1: replace
    "Accordingly, we reverse and remand with instructions to
    grant a conditional writ of habeas corpus, with instruc-
    tions to the state court either to grant Phillips a new trial
    on the special circumstance allegation within ninety days
    or to sentence him" with "Accordingly, we reverse and
    remand to the district court with instructions to grant a
    conditional writ of habeas corpus. The state may either
    grant Phillips a new trial on the special circumstance alle-
    gation within ninety days or sentence him"

With these amendments, the panel has voted to deny the
petitions for rehearing. Judge Kleinfeld would grant
Respondent-Appellee's petition for rehearing.

Judge Reinhardt voted to deny the suggestions for rehear-
ing en banc, and Judge Fletcher so recommended. Judge
Kleinfeld recommended denying Petitioner-Appellant's sug-
gestion for rehearing en banc, but recommended granting
Respondent-Appellee's suggestion for rehearing en banc.

The full court was advised of the suggestions for rehearing
en banc and no judge has requested a vote on whether to
rehear the matter en banc. Fed. R. App. P. 35.

The petitions for rehearing and the suggestions for rehearing en banc are **DENIED**. No further petitions for panel or en banc rehearing will be entertained.

---

# OPINION

REINHARDT, Circuit Judge:

In this case we consider a capital habeas corpus petition filed prior to the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA) and thus governed by pre-AEDPA law. Petitioner Richard Louis Arnold Phillips appeals the district court's denial of his habeas corpus petition on three grounds. First, he contends that the district court's procedural rulings improperly denied him a full evidentiary hearing. Second, he asserts that his trial counsel provided constitutionally ineffective assistance under the Sixth Amendment by allowing him to proceed with a manifestly unconvincing alibi defense without first investigating any alternative defenses. Third, he argues that the prosecution's failure to reveal that a key prosecution witness received significant benefits in exchange for her testimony after the witness falsely testified she had been promised no such benefits, coupled with the prosecutor's false representation to the jury that there was no agreement promising such benefits, violated his due process rights. We conclude that the district court did not err in its rulings governing the evidentiary hearing below, and we affirm its denial of Phillips's ineffective assistance of counsel claim.

With respect to Phillips's due process claim, we conclude, first, that, although the prosecution engaged in a deceptive ruse that this court has described as "a pernicious scheme without any redeeming features," *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005) (en banc) (quoting *Willhoite v. Vasquez*, 921 F.2d 247, 251 (9th Cir. 1990) (Trott, J., concur-

ring)), the evidence withheld from Phillips and misrepresented to the jury was not material to Phillips's convictions for attempted and first-degree murder, nor to his convictions for robbery, and we accordingly affirm these convictions. We hold, however, that the prosecution violated Phillips's due process rights by depriving him of, and willfully misleading the jury as to, critical evidence that was material to the special circumstance finding that the murder was committed during the course of a robbery (rather than vice versa). We therefore reverse and remand with instructions to grant the writ as to the jury's special circumstance finding, and, accordingly, Phillips's death sentence.

## I.    Factual Background

### A.    *The events of December 7, 1977*

In September of 1977, Phillips met Ronald Rose and Bruce Bartulis, two partners in a general contracting business who were building a pair of houses on property adjacent to Phillips's beachfront home in Newport Beach, California. The three men became acquainted when Phillips offered the contractors use of his electrical outlets to power their construction tools. Phillips and the contractors became friendly, and Phillips began to visit the construction site regularly to speak with them.

On the first or second day of November 1977, Phillips asked Rose and Bartulis if they wanted to invest in a cocaine deal with him. Under the deal as Phillips described it, Rose and Bartulis would contribute $25,000 to purchase cocaine that would be smuggled into the United States from Peru, and would receive a five-fold return on their investment. Rose and Bartulis agreed to the illegal investment and provided Phillips with $10,000 on November 2, 1977, with the $15,000 balance to be provided at a later date. Over subsequent weeks, Phillips inquired regarding the remaining balance multiple times. Approximately three to four weeks after the first payment,

Rose provided Phillips with an additional $1,500. Rose explained to Phillips that he and Bartulis had intended to finance the transaction using funds derived from their contracting business, and that the business had encountered financial difficulties. Rose at one point suggested that Phillips either use only the $11,500 already provided to finance Rose and Bartulis's share of the cocaine deal or return the money, and Phillips agreed to use the funds he had already received.

During the course of these discussions it emerged that Rose and Bartulis were having difficulty obtaining insulation for various construction projects. In late November or early December 1977, Phillips informed Rose that he was capable of acquiring stolen insulation and offered to arrange a sale of such material. Rose and Bartulis accepted Phillips's offer. According to Rose's testimony at Phillips's trial, Phillips told Rose "that his brother was a part of this deal," that the insulation was stored in a warehouse in Fresno, and that Rose and Bartulis would have to receive the insulation there.

Shortly thereafter, on December 7, Phillips informed Rose and Bartulis of the arrangements for the insulation transaction. Phillips told the two men to meet him that evening at a prearranged location in Fresno, a city in central California approximately four hours north of Newport Beach. From that location, they would drive to a second rendezvous point to meet Phillips's insulation source. That day, prior to leaving Newport Beach, Rose executed a notarized promissory note in the amount of $25,000 that he tendered to Phillips. Rose believed the note to be secured by property he owned, although he never signed the accompanying deed of trust. Of the $25,000 sum covered by the note, $13,500 constituted the balance on the cocaine deal and the remainder was intended as a down payment on a portion of the stolen insulation. Rose and Bartulis were unsure as to the total quantity of insulation they would ultimately purchase from Phillips's source, and Phillips therefore instructed them to bring as much additional cash to the meeting as possible.

After Rose gave Phillips the promissory note, they parted ways with plans to meet that evening in Fresno. Rose and Bartulis drove to Fresno in a two-door Ford Ranchero truck purchased by Rose for the construction firm and regularly used by Bartulis. In accordance with Phillips's suggestion that he bring extra cash, Rose carried with him to Fresno between $3,500 and $5,000 in $100 bills inside the left breast pocket of his jacket. Rose also brought a .44 magnum pistol.

Phillips flew to Sacramento, where his mother lived, intending to borrow his mother's car and drive to Fresno. Fresno is approximately two and half hours south of Sacramento by car. That same day, Sharon Colman, Phillips's girlfriend of two months, flew directly to Fresno. Colman had previously dated and lived with Phillips's best friend since childhood, Richard Graybill. Colman, a prostitute, had arranged to be picked up at the Fresno airport by a client. Her flight, however, was delayed, and her client was not there when she landed. She therefore called Phillips at his mother's house in Sacramento and asked him to pick her up at the Fresno airport, which he did.

From the Fresno airport, Phillips and Colman drove to meet Rose and Bartulis at a gas station. The four proceeded from there in two separate vehicles to Chowchilla, a town approximately thirty-five miles north of Fresno along Highway 99. Phillips and Colman led the way; Bartulis and Rose followed. Along the way, both cars stopped at a second gas station so that Phillips could use the restroom. Returning to his car from the restroom, Phillips stopped to talk to Rose, from whom he requested a pack of matches. Both cars then continued north on Highway 99.

Sometime after midnight, both cars pulled off the highway in Chowchilla and parked in a vacant lot. The lot was in a deserted area, with no buildings nearby. The vehicles parked alongside one another, with Phillips's car to the left so that the passenger door of his car was in line with and a few feet from

the driver-side door of the Ranchero. Phillips sat in the driver's seat of his car with Colman in the passenger seat; in the adjacent Ranchero, Bartulis sat in the driver's seat, with Rose in the passenger seat.

According to Colman, Phillips got out of his car and went to talk to Rose and Bartulis for a period of time through the driver-side window of the Ranchero before reentering his car through the passenger side, asking Colman to slide over. Colman testified that at some point approximately thirty to forty-five minutes after their arrival at the lot—after Rose and Bartulis had each finished some beers and smoked a marijuana cigarette—Phillips again exited his car and went to talk to Rose and Bartulis, leaning into the Ranchero's open driver-side window. Rose, however, stated that Phillips came and spoke to him and Bartulis through the driver-side window only once, and that the conversation occurred within five minutes, not thirty to forty-five minutes, of their arrival at the vacant lot.

This discrepancy as to timing aside, both Colman and Rose agree that, at some point after arriving at their destination, Phillips was leaning into the Ranchero's driver-side window talking to Rose and Bartulis when he fired six shots at the two men using his .45 automatic pistol. Colman saw the shots being fired from the gun in Phillips's left hand. Rose did not see the shots being fired, but he heard the shots come from his left. Rose was hit five times, with one bullet grazing his skull, another piercing his arm, and the remaining three entering his abdomen. Bartulis was shot a single time through his heart and died almost instantly.

Immediately after the shooting ceased, Phillips hit Bartulis on the head with the end of his gun, reached through the Ranchero's window and, without opening the truck door, pulled Bartulis's wallet out of the truck. He then walked to Rose's side of the vehicle and removed Rose's wallet and a handgun. Phillips returned to his car and handed both wallets, as well

as his and Rose's handguns, to Colman. In addition to Rose and Bartulis's identifications, the two wallets contained a total of between $120 and $150. Phillips did not remove from the Ranchero approximately $162 from Rose's pants pocket, nor did he take the $3,500 to $5,000 wad of one-hundred-dollar bills that was in the breast pocket of Rose's jacket. Phillips then directed Colman to open the trunk of his car, from which, according to Colman, he retrieved a gas can, and proceeded to pour gasoline over Rose and Bartulis's bodies inside the Ranchero. As Colman moved Phillips's car across the street, Phillips lit the two bodies on fire and made his way back to his car.

Upon being lit on fire, Rose (who had been shot five times) jumped out of the now burning Ranchero, and removed his flaming jacket. He was unable to remove the rest of his burning clothing and began to run around in pain. Phillips, upon seeing that Rose was still alive, drove toward him and hit him with his mother's car, cracking the windshield. Phillips and Colman then drove back to Phillips's mother's house in Sacramento.

Shortly after Phillips and Colman left the scene, Madera County Sheriffs discovered Rose (who was remarkably still alive), extinguished his burning clothing, and transported him to the hospital, where he underwent surgery followed by three months of burn treatment and rehabilitation. The deputies also found Rose's smoldering jacket, which still contained the packet of $100 bills that Rose had carried with him from Newport Beach.

The morning after the shootings, Phillips took his mother's car to a shop to have the cracked windshield repaired. Within a week, Rose was able to communicate to the Madera sheriffs the names of the people who accompanied him to the vacant lot. Arrest warrants for Phillips and Colman were issued on December 14th. Upon learning of the warrants, Colman and Phillips drove in a Corvette borrowed from Phillips's brother-

PHILLIPS v. ORNOSKI                    5785

in-law to Salt Lake City, where Phillips got a job and assumed a false identity. Colman stayed with Phillips in Utah for one or two weeks and then returned to Sacramento in the Corvette. Shortly thereafter she turned herself in to the Madera County Sheriff's Department.

Colman was taken into custody and was appointed counsel on December 27, 1977, three weeks after the shooting. The next day, December 28, Colman and her counsel met with the lead investigating officers from the Madera sheriff's department and with the district attorney, David Minier. During that meeting, Colman gave a detailed account of the shooting and the events leading up to it. Notably, during this hour-long interview, Colman did not indicate that Phillips had searched Rose for any length of time, nor did she say that he mentioned being unable to find the money that Rose had brought with him, or that he was disappointed by the absence of cash. To the contrary, she stated that on the ride back from Chowchilla Phillips disclosed to her his motive for the murder. That motive, according to Colman, was not robbery but a desire to eliminate Rose and Bartulis because he was concerned that they were setting him up, that they would double-cross him, and that they knew "too much about where the coke was coming from." In a subsequent interview with police on January 4, 1978, Colman changed her story on these points completely, now stating that Phillips complained after he returned to the car that he was disappointed not to have found Rose's money. She adhered to and indeed embellished upon the latter version of her story at trial, testifying that Phillips had spent "a lot longer" searching Rose than he had spent searching Bartulis, that upon returning to the car Phillips stated "that he couldn't find the money that [Rose] had on him," and that during the drive to Sacramento Phillips repeatedly expressed frustration that he had been unable to find the cash brought by Rose. Although Colman was at the time of her second police interview subject to the same capital charges as Phillips, two months after she gave her statement to the District Attorney

she was released on bail without explanation, and her bail status was eventually adjusted to personal recognizance.

Once she was released from pre-trial custody, Colman moved back in with Richard Graybill, her former boyfriend. On March 13, 1978, just a few weeks after her release, Colman and Graybill were arrested for selling heroin to an undercover Fresno police officer. After the Madera County Sheriff's Department made multiple calls to the Fresno police department on Colman's behalf requesting that charges against her not be pursued because she was an important witness in a homicide investigation, the charges against her were dropped.

With the assistance of Graybill, the Madera sheriffs and the FBI located Phillips in Salt Lake City. Phillips was arrested and was eventually extradited to California to face prosecution. He was charged with the first degree murder of Bruce Bartulis, the attempted murder of Ronald Rose, and the robbery of both Bartulis and Rose. The prosecution also alleged as a special circumstance that the murder was committed in furtherance of a robbery. An affirmative jury finding with respect to the special circumstance was a necessary precondition to the holding of a capital sentencing proceeding and imposition of the death penalty. Phillips's trial began in January of 1980.

B.   *The Trial*

The prosecution's theory at trial was that Phillips conned Rose and Bartulis from the start in order to rob them. Minier, the Madera County District Attorney who prosecuted Phillips, argued that he never had any intention to import cocaine and there never was any stolen insulation, but rather Phillips had used the promised deals as ruses in order to steal tens of thousands of dollars from Rose and Bartulis before attempting to murder them and steal more. The prosecution argued that on December 7, the night of the shooting, Phillips lured the two

men to the remote lot in Chowchilla with the intention of kill-
ing them, stealing the cash they brought with them to the
meeting, and keeping the money that he had already received
from them without ever having to produce a profit on the non-
existent cocaine deal.

To support this theory, the prosecution highlighted a num-
ber of facts, drawn almost exclusively from the testimony of
Rose and Colman, to show the careful planning that went into
the killings. As evidence of that planning, the prosecutor
argued that Phillips sought to manufacture an alibi by flying
to his mother's house in Sacramento prior to driving to
Fresno, rather than simply flying to Fresno directly as Colman
did. As further evidence of premeditation, the prosecutor
emphasized that, prior to meeting up with Rose and Bartulis,
Phillips put a gasoline can in the trunk of his mother's car,[1]
and that Phillips had asked Rose for matches when the two
cars stopped en route to the vacant lot, actions that the prose-
cution argued showed Phillips intended in advance to burn his
victims.[2]

The prosecutor likewise underscored evidence indicating
that Phillips acted in a particularly methodical and cold-
blooded manner. For example, he argued that Phillips sought
to cover his tracks, not only by burning the bodies, but by
picking up the bullet shell casings off the ground after the
shooting, as there was only one shell recovered from the
scene despite multiple shots being fired. He further argued
that Phillips's cold-blooded manner was evidenced by Col-
man's testimony that Phillips struck Rose and Bartulis in the
head after shooting them.

---

[1]Phillips's mother testified that she did not normally carry a gasoline can
in the car.

[2]In a subsequent penalty phase retrial, Rose explained that he gave Phil-
lips a marijuana cigarette along with the matches, but at Phillips's initial
guilt trial he testified only that Phillips had requested matches.

In addition to emphasizing facts suggesting premeditation and extensive advanced planning, the prosecutor highlighted evidence supporting the contention that Phillips's cocaine and insulation scheme was a ruse orchestrated to steal money from Rose and Bartulis. He emphasized that Phillips told Rose and Bartulis that the stolen insulation was going to be supplied by his brother even though Phillips does not have a brother.[3] The prosecutor also argued that the fact that Phillips told Rose to bring "as much money as he could get a hold of" to Fresno showed that Phillips planned to rob Rose and Bartulis once they got to the deserted lot. Similarly, the prosecutor stressed that Phillips searched the bodies after the shooting and took Rose and Bartulis's wallets. He also stressed that, according to Colman, Phillips said that he was upset that he could not find the money he expected Rose to be carrying.

Phillips's primary defense at trial was that he was not at the crime scene at all. This alibi rested almost exclusively on Phillips's own testimony. Phillips took the stand and testified that on the night of the shooting he was at an illicit business meeting at a disco. He claimed that he had helped set up the insulation deal, but that the deal itself was attended only by Rose, Bartulis, and Graybill (who was to supply the insulation). He further claimed that the real killers were Colman and Graybill, to whom he had loaned his mother's car on the night of the shooting. Phillips testified that Graybill returned to Phillips's mother's house at approximately 4:30 a.m. the morning of the shooting and that the windshield of the car was smashed. Finally, Phillips claimed that at some point he decided to take the fall for Graybill, thinking that he could plead guilty to second degree murder and thereby keep his longtime friend out of prison. Phillips did not offer a single witness to corroborate his alibi, and, when pressed for any

---

[3]Ever since Phillips abandoned his alibi testimony, he has maintained that the reference to "his brother" was intended to refer to his childhood friend Graybill. Rose could not remember at trial if Phillips had said "my brother" or "a brother."

details or specifics supporting it, such as the names of the people at his supposed meeting, he refused to respond, opting instead to plead the Fifth Amendment or asserting that if he gave any details regarding his criminal associates he "wouldn't be alive."

Phillips's attorney, Paul Martin, emphasized two arguments in addition to Phillips's improbable alibi. First, Martin repeatedly highlighted evidence suggesting that Bartulis's murder did not occur during the course of a robbery, stating in his closing argument, for example, that,

> This would be a dumb way to pull a plain, ordinary robbery, to meet two people in a rural area not knowing if they had any money or how much money, if any, . . . this is no way to pull a robbery. This is a poor theory in my opinion, . . . particularly when one of the individuals owes the man charged $25,000.

Later in his argument, Martin noted, regarding Phillips's failure to find the cash stashed in Rose's jacket pocket, that "[i]t's hard to miss a wad the size of a cigarette package in the upper breast pocket. If the pocket has something in it the size of a package of cigarettes, it's not easily missed if someone is a cool criminal."

Second, Martin insinuated that Colman was lying in exchange for offers of leniency from the prosecution. Martin introduced evidence that Colman—who, like Phillips, had been charged with capital murder in connection with the events of December 7, 1977—had been granted an unusual number of continuances for her preliminary hearing, and been released on her own recognizance notwithstanding the capital murder charges against her. In his closing statement, Martin emphasized that:

> She's threatened with the charge of murder. Why has it been continued for two years, more or less? . . .

> [S]he's now on her own recognizance; doesn't even
> have to post a bail bond. She's out on the street.
> . . . What's the purpose in continuing it for two
> years? Her case could have been resolved with what-
> ever deal they're going to make, and there's, obvi-
> ously, a deal of some kind anticipated. . . . [T]hey're
> holding a murder charge over her head to compel her
> to testify, and she's singing like a bird, the tune that
> they call.

Colman, however, flatly denied having received any benefi-
cial treatment in exchange for her testimony, and stated only,
"I'm expecting that they would take into consideration that I
am willing to cooperate." Colman further stated, "My attorney
has advised me to testify and to put my confidence in my
attorney," explaining, "She asked me if I had confidence in
her, and if I had confidence in her that — to go under her
advisement, and that her advisement was to testify." In his
closing statement, the prosecutor, Minier, reaffirmed Col-
man's denial that she had been promised any benefits, empha-
sizing that she had testified "she has never been promised
anything for her testimony in this case," and that any efforts
by the defense to insinuate she had received a deal were
"sheer fabrication, just pulled out of the air, totally meaning-
less."

The jury convicted Phillips on all counts, including the
first-degree murder of Bartulis, and found the special circum-
stance of murder during the commission of a robbery to be
true. At the subsequent penalty phase of the trial, Phillips was
sentenced to death.

C.  *Post-Conviction Proceedings*

Phillips appealed his conviction and sentence directly to the
California Supreme Court. *See People v. Phillips*, 711 P.2d
423 (Cal. 1985). Five years after the appeal was filed, the
court affirmed Phillips's conviction but reversed his death

sentence. The case was remanded for a new penalty phase
trial. *Id.* at 459. While he awaited a penalty phase retrial, Phil-
lips filed a state habeas corpus petition making the claim,
among others, that the trial prosecutor, Minier, had offered a
plea deal to Colman's attorneys with the proviso that the deal
not be communicated to Colman herself and that the deal was,
in fact, communicated to Colman. Phillips argued that Minier
violated his obligations under *Brady v. Maryland*, 373 U.S. 83
(1963) by failing to disclose the benefits that Colman received
in exchange for her testimony, and violated *Napue v. Illinois*,
360 U.S. 264 (1959) by failing to correct Colman's false testi-
mony regarding those benefits. The state court denied Phil-
lips's *Brady/Napue* claim for failure to demonstrate
materiality.

In October 1991, Phillips received a penalty phase retrial,
and was again sentenced to death. On March 4, 1992, he filed
this federal habeas petition in the district court, advancing his
*Brady/Napue* claims and a claim of ineffective assistance of
counsel, among others. The district court declined to entertain
Phillips's petition because his appeal from his penalty retrial
was at that time still pending in the California state courts.
This panel reversed that decision on May 26, 1995, holding
that Phillips could file a habeas petition as to the guilt phase
separately from any petition as to the penalty phase. *Phillips
v. Vasquez*, 56 F.3d 1030 (9th Cir. 1995). On remand and
after briefing, the district court denied Phillips's petition with-
out an evidentiary hearing, holding that Phillips had not set
forth any colorable claims for relief. We again reversed, hold-
ing that Phillips was entitled to an evidentiary hearing on both
his ineffective assistance and *Brady/Napue* claims. *Phillips v.
Woodford*, 267 F.3d 966 (9th Cir. 2001).

On remand, the district court scheduled a three-day eviden-
tiary hearing to begin on November 6, 2002. The date was
later continued to December 4, 2002, and then to February 4,
2003. On October 15, 2002, Philips moved to be rehoused in
the Madera County jail to better assist his counsel in prepar-

ing for the hearing.[4] The district court denied his request, finding that "the convenience of counsel is not sufficient to justify the risk and expense involved with a federal court ordering a state entity to move a prisoner." The district court denied reconsideration on November 19, 2002.

On December 30, 2002, the district court issued an order stating: "After careful consideration, it is ORDERED that depositions in lieu of testimony be taken of David Minier, Paul Martin, Ron Rose, Sharon Colman, Tom Peterson, and Casandra Dunn." Neither party objected to the order.

Depositions were conducted between January 6th and January 13th, 2003. On January 16, 2003, Phillips filed a motion for a temporary protective order to prevent his deposition from being taken. On January 21, 2003, the district court denied his request, finding no basis for the protective order. The court then ruled, apparently acting sua sponte, that "all evidence in the upcoming evidentiary hearing will be presented by deposition . . . and the evidentiary hearing set to begin February 4, 2003 [is] vacated." The district judge asserted that this ruling was "[b]ased on prior agreement of the parties."[5]

On October 21, 2003, Phillips filed a motion requesting permission to file supplemental exhibits. Phillips then filed a motion on November 5, 2003, asking the district court to reconsider its order vacating the evidentiary hearing. The district court refused to reconsider its order, stating that, "[b]ased on prior representations by both parties, no witnesses

---

[4]Phillips stated that because his counsel during the state habeas proceedings had suffered from a nervous breakdown, no one other than himself had the knowledge of the case necessary to assist his appointed counsel in preparing the files for the scheduled hearing.

[5]Evidence of such an agreement does not exist in the record, although the status conferences held on May 13 and August 27 of 2002 were not transcribed.

remained to testify at a hearing, so written argument was determined to be more effective than oral argument and more effective than oral argument and briefs." In that same order, the court refused Phillips's request to file supplemental exhibits, holding that the documents were "untimely" and, in any event, were either duplicative or irrelevant. On February 20, 2004, the district court denied Phillips's guilt-phase claims, ruling on the merits that Phillips had not been prejudiced by any violations that occurred with respect to either his ineffective assistance of counsel claim or his *Brady/Napue* claims.

## II.   Standard of Review

Because Phillips filed his federal habeas petition before the effective date of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), "AEDPA's substantive provisions do not apply to this appeal." *Phillips*, 267 F.3d at 973 (citing *Lindh v. Murphy*, 521 U.S. 320, 327 (1997)). We therefore review *de novo* questions of law or mixed questions of law and fact decided by the district court or by the state courts. *Jackson v. Brown*, 513 F.3d 1057, 1069 (9th Cir. 2008). We review the district court's factual findings for clear error, and accord state court factual findings a presumption of correctness. *Id.* The district court's procedural rulings, including its decision to limit the evidentiary hearing to written evidence, are reviewed for abuse of discretion. *Wade v. Calderon*, 29 F.3d 1312, 1326 (9th Cir. 1994).

## III.   Adequacy of the Evidentiary Proceeding Below

Phillips claims that, in conducting the evidentiary hearing below, the district court abused it discretion by: (1) refusing to order Phillips transferred from death row in San Quentin to the Madera County jail; (2) canceling the live hearing scheduled for February 4, 2003; and (3) refusing to accept his "Supplemental Guilt Exhibits." We now address each contention.

## A.  Denial of Transfer

[1] Although Phillips presented several compelling reasons to justify his transfer from San Quentin to Madera, the district court did not abuse its discretion in denying this motion. A prisoner has no right to be housed in a particular institution. *Rizzo v. Dawson*, 778 F.2d 527, 530 (9th Cir. 1985); *see also Meachum v. Fano*, 427 U.S. 215, 224 (1976). Moreover, as Phillips acknowledged in his motion for relocation, the power to order a prisoner transferred is to "be exercised at the sound discretion of the court." The district court's holding that the risks and costs of relocation so outweighed the inconvenience suffered by Phillips's defense team does not constitute a "clear error of judgment," as is required to find an abuse of discretion. *See SEC v. Coldicutt*, 258 F.3d 939, 941 (9th Cir. 2001).

## B.  Vacatur of the Live Hearing

[2] Applying pre-AEDPA law, we conclude that the district court's decision to limit the evidentiary hearing to written evidence likewise did not constitute reversible error. This court has held that such a decision is within the district court's discretion. *Williams v. Woodford*, 306 F.3d 665, 688 (9th Cir. 2002) ("[A] district court in a habeas proceeding 'need not conduct full evidentiary hearings,' but may instead 'expand the record . . . with discovery and documentary evidence.' ") (quoting *Watts v. United States*, 841 F.2d 275, 277 (9th Cir. 1988) (per curiam)). Because, as the district court observed, "no witnesses remained to testify at [the] hearing" who had not already been deposed, avoiding the time and expense of the live hearing was a legitimate reason to vacate the earlier order. *See Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) ("[A district court] may avoid the necessity of an expensive and time consuming evidentiary hearing in every [federal habeas] case. It may instead be perfectly appropriate, depending upon the nature of the allegations, for the district court to proceed by requiring that the record be expanded to

include letters, documentary evidence, and . . . even affida-
vits.") (quoting *Raines v. United States*, 423 F.2d 526, 529-30
(4th Cir. 1970)). Although Phillips argues that he was preju-
diced by this ruling because had he known there would be no
hearing he would have conducted his depositions differently,
he had notice by at least December 30, 2002, that depositions
would be used in lieu of live testimony for all witnesses, save
one, then known to the court.[6]

## C.  Refusal to Admit Supplemental Exhibits

[3] Finally, the district court did not abuse its discretion by
refusing to admit Phillips's supplemental exhibits. The district
court, in an order filed on January 21, 2003, set a clear brief-
ing schedule for its decision on the merits of Phillips's habeas
petition: Phillips's opening brief and supporting documenta-
tion were due on January 31, 2003, and his reply was due on
February 14, 2003. In a previous order, the court had ruled
that the deadline for the end of discovery was January 15,
2003. Phillips attempted to file his supplemental exhibits on
October 21, 2003, over eight months after the deadline for
post-deposition filings and discovery had passed. All of the
documents Phillips sought to introduce existed prior to 1991.
Phillips argued to the district court that the delay was due to
the disarray of his former attorney's files, but "[g]iven the dis-
cretion of the district court to 'control proceedings before it,'
the district court did not abuse its discretion in finding that
[the] motion . . . came too late in the proceedings." *United
States v. Alisal Water Corp.*, 370 F.3d 915, 922 (9th Cir.
2004) (quoting *United States v. Oregon*, 913 F.2d 576, 588
(9th Cir. 1990)).

---

[6]Phillips also contends that the district court erred by denying his right
to be present at the evidentiary hearing. The district court had ruled that
Phillips could not attend the hearing two months before it vacated it.
Because we hold that the district court did not abuse its discretion in
vacating the hearing itself, this claim must also fail.

5796                          PHILLIPS v. ORNOSKI

## IV.  Ineffective Assistance of Counsel

Phillips's ineffective assistance claim is straightforward: "[he] contends that his trial counsel, Paul Martin, rendered ineffective assistance by presenting [a] patently meritless alibi defense to the jury without investigating any other defenses — notably, the defense that Bartulis was killed during a shoot-out" between Phillips and Rose. *Phillips*, 267 F.3d at 976.

In our 2001 opinion reversing the district court's denial of an evidentiary hearing, we held that "Phillips's defense counsel *did not* reasonably select the alibi defense used at trial. In this case, . . . the defense used at trial was not selected on the basis of a reasonable investigation or strategic decision." *Id.* at 980. Martin's performance in this case was, indeed, questionable. Without investigating any alternative defenses, Martin allowed his client, who was charged with capital murder, to present an improbable alibi defense despite the fact that his client was unwilling to divulge, as part of that defense, exactly where he was or what he was doing at the time of the murder. What is more, Martin apparently committed to the alibi defense based upon his questionable conclusion that he was ethically prohibited from investigating a shoot-out theory once Phillips, in his very first discussion with him about the facts of the case, said he was not at the scene of the crime.

**[4]** However, after we issued our opinion holding that Martin performed deficiently when he failed to investigate alternatives to Phillips's alibi defense, the Supreme Court held that the Sixth Amendment does not impose a strict "constitutional duty to investigate" upon attorneys working in capital cases. *Cullen v. Pinholster*, 131 S.Ct. 1388, 1406-07 (2011). In so doing, it relied on "the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions," *id.* at 1406 (quoting *Strickland v. Washington*, 466 U.S.668, 689 (1984)), as well as the "strong presumption that counsel made all significant

decisions in the exercise of reasonable professional judgment," *id.* at 1407 (citations and internal quotation marks omitted).

**[5]** Here, although Martin's strategic decision to proceed with an alibi defense was highly questionable at best, the record suggests that Martin did attempt to explain to Phillips that alibi defenses generally are not feasible when the defendant refuses to account for his whereabouts at the time of the crime. Moreover, Martin's investigation did yield a witness whose testimony provided modest support for Phillips's alibi defense: the proprietor of a business not far from the scene of the crime testified that the morning after the shootings, an individual other than Phillips loitered in his establishment brandishing a .45 automatic weapon of the sort used in the shootings, and that the individual's car had multiple bullet holes in it. In short, Martin attempted to confront his client with the shortcomings of his alibi defense and, remarkably, found a witness whose testimony tended to corroborate that defense. Although Martin's decision to pursue the defense at trial was most assuredly ill-advised, we cannot, in light of *Pinholster,* maintain our conclusion that his decision to pursue the strategy urged by his client did not fall within the "wide latitude counsel must have in making tactical decisions." 131 S.Ct. at 1406. Accordingly, in light of the Supreme Court's intervening decision, we are compelled to overrule our 2001 holding that Martin's performance at Phillips's trial was constitutionally ineffective, and to now hold that his shortcomings were not such as to overcome the "strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 1407.

## V.   Violation of Phillips's Due Process Rights

**[6]** It is a fundamental principle of the American criminal justice system that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible

5798                          PHILLIPS V. ORNOSKI

with [the] rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotation marks omitted). When the government obtains a criminal conviction and deprives an individual of his life or liberty on the basis of evidence that it knows to be false, it subverts its fundamental obligation, embodied in the Due Process Clauses of the Fifth and Fourteenth Amendments, to provide every criminal defendant with a fair and impartial trial. The Supreme Court has accordingly held that the government may not knowingly suppress evidence that is exculpatory or capable of impeaching government witnesses. *See Banks v. Dretke*, 540 U.S. 668, 691 (2004) (discussing *Brady v. Maryland*, 373 U.S. 83 (1963)). Similarly, it has held that the government is obligated to correct any evidence introduced at trial that it knows to be false, regardless of whether or not the evidence was solicited by it. *See Napue v. Illinois,* 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Pyle v. Kansas*, 317 U.S. 213 (1942).[7] These duties provide fundamental protections that are vital to the successful operation of an adversarial system of criminal justice; they embody the state's obligation not to obtain the accused's conviction at all costs, but rather to do justice by furthering the truth-finding function of the court and jury.

[7] In this case, the state went to elaborate lengths to suggest to the jury that Colman, whose testimony was critical to securing a finding that Phillips murdered Bartulis during the commission of a robbery, had received no benefits in exchange for her testimony, when in fact her attorney had entered into an agreement on her behalf that would allow her to escape prosecution on capital murder charges, and all other

---

[7]*Napue* prohibits the government from knowingly using false evidence to obtain a criminal conviction, while *Alcorta* and *Pyle* obligate the government to correct false evidence thus presented. *See Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc). For simplicity, we refer to the state's failure to fulfill its obligation not to present false evidence, and to correct it once presented, as a *Napue* violation.

PHILLIPS V. ORNOSKI                    5799

charges related to the offenses allegedly committed by her
and Phillips, in exchange for her testifying against him. More-
over, in furtherance of that agreement, Colman had testified
against Phillips in reliance on her attorney's recommendation
that she do so. She also, as a result of the Sheriff's Depart-
ment's intervention on her behalf regarding a major drug traf-
ficking offense she committed while on bail, was allowed to
escape prosecution for that crime.

At trial, Colman responded to questions from Phillips's
defense attorney Paul Martin by denying that she had been
promised lenient treatment in exchange for her testimony:

Q   And you expect to receive some benefit for testi-
fying here today?

A   No.

Q   You don't expect to receive any consideration
whatsoever for testifying?

A   I'm hoping that there will be consideration but
—

Q   You really expecting to receive some consider-
ation?

A   Are you asking me if I have been promised or is
that —

Q   I'm asking you for your expectation.

A   I'm expecting that they would take into consid-
eration that I am willing to cooperate. . . .

Q   So you expect to receive some credit or benefit
in giving testimony here?

5800                    PHILLIPS v. ORNOSKI

    A   I'm hoping that they will take that into consider-
ation.

    Minier, the prosecutor who entered into the immunity
agreement on behalf of the state, emphasized Colman's testi-
mony to the jury in his closing argument:

>   If the defense, in their arguments, suggests she is a
>   liar, she is motivated by her desire for leniency, and
>   you can't trust her . . . . Well, look at what she said.
>   *She testified . . . that she has never been promised*
>   *anything for her testimony in this case.* She also tes-
>   tified that she was hoping for consideration . . . . And
>   it only seems reasonable that she would hope and
>   anticipate that she would be treated leniently, and, of
>   course, that's why she's testifying.

    Likewise, in his rebuttal closing Minier told the jury:

>   [Defense counsel] Martin suggested that on the day
>   of the defendant's arrest . . . that was the day the bar-
>   gain was struck with Colman. What bargain we
>   don't know. It doesn't even make any sense. *I'd sug-*
>   *gest to you, that that kind of an argument is sheer*
>   *fabrication, just pulled out of the air, totally mean-*
>   *ingless.*

    Over the course of his habeas proceedings Phillips has
established that, contrary to her testimony and Minier's state-
ments, Colman was offered and received significant benefits
from the state in exchange for testifying as she did. Phillips
points to substantial, possibly life-saving benefits that Colman
received in exchange for her testimony, and claims that the
prosecution's failure to disclose these benefits or correct Col-
man's statements that she expected no such benefits, and per-
haps even more important Minier's deliberate efforts to
mislead the jury and the court as to the existence of an immu-
nity agreement, violated his due process rights under *Napue*

and *Brady*. We examine the benefits cited by Phillips, and conclude that they involved violations of both *Napue* and *Brady*. We also consider a separate *Brady* violation that arises from the state's failure to divulge a prior plea offer and Colman's possible initial acceptance of it. Because these violations constitute a deprivation of Phillips's right to due process only if they were material to Phillips's various convictions, we then consider whether Phillips was prejudiced as to any of them by the prosecution's failure to comply with the dictates of *Napue* and *Brady*.

## A.    *Colman's Immunity Agreement*

The principal undisclosed benefit that Colman received for her testimony flowed from an immunity agreement struck between Minier and her trial lawyer, Cassandra Dunn, on Colman's behalf. This agreement was reached after Dunn replaced Colman's first lawyer, Tom Peterson.[8] As Minier acknowledged in a 1990 declaration, "I did have an agreement with [Dunn] about the benefit Colman would receive for testifying." Under the terms of that deal all charges, including capital murder, against Colman relating to her role as Phillips's accomplice would be dropped completely if and when she testified against Phillips. Dunn, in a 2003 deposition, confirmed the nature and existence of this agreement with Minier, and testified that, after asking Minier to put the agreement in writing, she "shortly thereafter" received a letter in which he "confirmed that he had met with [Dunn] and that he had agreed that [her] client would receive immunity if she testi-

---

[8]Peterson represented Colman from when she first turned herself in to the police on December 27, 1977, until Dunn took over her representation in February 1978. Peterson had also engaged in negotiations with the prosecution. As is discussed further below, the prosecution offered Peterson a deal, which he communicated to Colman, that would allow her to plead guilty to a charge carrying a one year sentence if she testified against Phillips. *See infra* Section V.C. The difference between the two deals is essentially that under the Dunn version Colman was not required to serve *any* time.

fied truthfully." Although neither Minier nor Dunn could recall during postconviction proceedings exactly when they had negotiated this deal, Dunn testified that it was reached some time before Phillips's preliminary hearing in July 1979. Consistent with Minier's practice at the time, the deal was offered to Dunn on the condition that it not be communicated to Colman, so that Colman would be capable of "truthfully" representing to the jury that she had received no offers of leniency in exchange for her testimony. Both Dunn and Colman contend that Dunn acceded to Minier's wishes, and did not communicate the existence of the offer to Colman. Dunn did, however, urge Colman to put her confidence in her, and then advised her to testify. Colman stated at trial that she did testify against Phillips in reliance on Dunn's advice to do so.[9] All charges against Colman were dropped within a month of Phillips's conviction.

[8] *Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) (en banc) controls this case. It compels us to hold that the prosecution's failure to disclose the existence of the agreement to dismiss the charges against Colman, and to correct her and Minier's own statements at trial that no such deal existed, violated both *Napue* and *Brady*. The facts in *Hayes* are virtually identical. In *Hayes*, as here, the prosecutor had reached a deal with the attorney for a key state witness, James, providing for the dismissal of all felony charges against him—including those relating to the murder with which the defendant Hayes was charged—if he testified against Hayes at trial. *Id.* at 977. As in this case, the prosecution elicited a promise from James's attorney that James would not be informed of the

---

[9]We might note that it appears highly improbable that Colman, who was offered a one year sentence through her first lawyer if she testified against Phillips, never asked her second lawyer before she testified what the consequences to her might be if she did not testify or if she testified without immunity. Nor does it seem likely or at all reasonable that she would have failed to ask before testifying whether any offer had been made regarding the disposition of the charges, including the capital charges, which she faced.

deal, and at trial James testified that he had received no prom-ise of benefits in exchange for his testimony. *Id.* at 977, 980. As we observed in *Hayes*, and as is equally applicable here, that a witness may have been unaware of the agreement entered into on his behalf may mean that his testimony deny-ing the existence of such an agreement is not knowingly false or perjured, but it does not mean it is not false nevertheless. As we explained in *Hayes*:

> [T]hat the witness was tricked into lying on the wit-ness stand by the State does not, in any fashion, insu-late the State from conforming its conduct to the requirements of due process. . . . It is reprehensible for the State to seek refuge in the claim that a wit-ness did not commit perjury, when the witness unknowingly presents false testimony at the behest of the State. "This saves [the witness] from perjury, but it does not make his testimony truthful." *Willho-ite v. Vasquez*, 921 F.2d 247, 251 (9th Cir. 1990) (Trott, J., concurring). The fact that the witness is not complicit in the falsehood is what gives the false testimony the ring of truth, and makes it all the more likely to affect the judgment of the jury. That the witness is unaware of the falsehood of his testimony makes it more dangerous, not less so.

*Id.* at 981.

**[9]** Minier's effort to "insulate" Colman from her own immunity agreement was a deliberate effort to deceive the jury—a ruse that flagrantly violated basic due process princi-ples. As in *Hayes*, Colman's denial that she expected to receive benefits for testifying carried with it a necessarily implied falsehood: it created the impression that she was not the beneficiary of any sort of deal. *Id.* at 981, 983; *see also Alcorta*, 355 U.S. at 31 (holding that a habeas petitioner had been denied due process of law when a prosecutor allowed a witness to give the jury a "false impression" of his relation-

ship with the petitioner's wife). In fact, there was a deal, one that would allow her to escape prosecution entirely after having confessed in open court to being an accomplice to capital murder. This deal was not only not disclosed to the defense,[10] see *Giglio*, 405 U.S. at 154, but it also served to facilitate the presentation of false testimony to the jury by inducing Colman to testify that she had received no promise of benefits in exchange for her testimony, when, in fact, her attorney, who

---

[10]The district court found that "all parties understood [Minier] had a deal with Dunn but Colman had not been told about it." Martin's arguments at trial suggest that he suspected that a deal of some sort existed, but there is no indication in the record that he in fact knew of the deal. The state finds evidence of Martin's knowledge in Minier's statement in his 2003 deposition that Martin "was not an idiot. Obviously, any defense attorney in that position would know that there was going to be a benefit. . . . [T]o suggest that he had no inkling would be total nonsense." But Minier also acknowledged, "I don't believe I ever told Mr. Martin what the agreement was," and that if Martin knew there was "going to be a benefit, . . . he probably didn't know just what it was." In any event, it is " 'irrelevant' whether the defense knew about the false testimony." *Sivak v. Harrison*, 658 F.3d 898, 909 (9th Cir. 2011) (quoting *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1122 (9th Cir. 2001)). That Phillips's attorney might have had a generalized suspicion that a deal between Minier and Colman's attorney existed did not relieve the state of its *Brady* obligation to actually disclose the existence of that deal as well as its terms, nor did it permit the state to violate its *Napue* obligation and allow false testimony to go uncorrected. Certainly, it did not excuse the prosecutor's deliberate effort to mislead the jury and the court by making false statements of his own.

The state also observes that the trial court had ruled that, even if a deal between Minier and Colman's attorney existed, the defense could not introduce evidence of it. The California Supreme Court has held that the trial court's ruling was in error because "[t]he defense counsel is entitled to discover the terms of any agreement for lenient treatment negotiated on behalf of a prosecution witness." *People v. Phillips*, 711 P.2d 423, 433 (Cal. 1985). More important, the trial court's ruling is irrelevant to whether the prosecution had a constitutional duty to affirmatively correct the falsehoods in Colman's testimony and refrain from making its own misrepresentations to the jury.

was her agent, had accepted the immunity agreement on her behalf.[11]

In *Hayes* we made clear in no uncertain terms that the practice of "insulating" a witness from her own immunity agreement so that she can profess ignorance of the benefits provided in exchange for her testimony is an egregious violation of the prosecution's obligations under *Napue*. We explained that:

> There is nothing redemptive about the sovereign's conspiring to deceive a judge and jury to obtain a tainted conviction. This is, as Judge Trott put it, "a pernicious scheme without any redeeming features." *Napue* forbids the knowing presentation of false evidence by the State in a criminal trial, whether through direct presentation or through covert subornation of perjury.

*Hayes*, 399 F.3d at 981 (internal citation omitted). We concluded such deception violates *Napue* because, regardless of whether or not the prosecution's offer is communicated to the

---

[11]That Colman's attorney went along with the prosecutor's scheme is troubling in itself. As we noted in our 2001 opinion granting Phillips an evidentiary hearing on his claims,

> it was not only the prosecutor whose conduct was deplorable, but the second defense attorney as well. If Dunn indeed concealed from her client the existence of a plea bargain or immunity agreement, and allowed her client—who faced capital murder charges—to testify without any knowledge of the agreement she had reached on her behalf, she plainly violated her ethical duty to "keep [Colman] reasonably informed of significant developments" regarding her case, Cal. Bus. and Prof.Code § 6068(m), and failed to "explain [the] matter to the extent reasonably necessary to permit [Colman] to make informed decisions regarding [her] representation." Model Code of Professional Conduct Rule 1.4 (1983).

*Phillips,* 267 F.3d at 984 n.11.

5806          PHILLIPS V. ORNOSKI

witness prior to her testimony, the practice poses "the distinct risk that, in preparing [a witness] for his testimony . . . counsel—who did know about the deal—might have influenced the content of that testimony, deliberately or not." *Id.* at 981 n.1. Here, Dunn's advice to Colman almost certainly conveyed the implicit message that she would be treated favorably by the prosecution if she testified, and may well have led her to testify in a manner she believed would satisfy the prosecution's *wishes*: only an expectation on Colman's part that she would receive treatment similar to or more favorable than that embodied in the earlier offer of a one year term[12] could explain her decision not to accept that offer and then proceed to incriminate herself in open court of being an accomplice to capital murder. Indeed, if Minier did not expect that the offer would affect Colman's willingness to testify or influence the contents of her testimony, it is hard to fathom why he made an immunity deal at the time he did for the benefit of an individual charged as an accomplice to capital murder. *See id.* at 987.

Viewed in the most favorable light to the prosecution, Minier's deplorable tactic allowed Colman to falsely deny having received any promise of beneficial treatment in exchange for her testimony without knowing that her testimony was false. It resulted in Minier arguing to the jury in the most unequivocal terms (albeit in terms designed to deliberately mislead the jury and the court) that Colman had received no leniency or other promise of benefits in exchange for her testimony, emphasizing that "[s]he testified . . . that she has never been promised anything for her testimony in this case," and that any attempts by the defense to intimate that an agreement existed were "sheer fabrication, just pulled out of the air, totally meaningless." In this respect, the prosecution's misconduct went even beyond that which this court held to be reprehensible in *Hayes*, where the prosecution vouched for

---

[12]*See supra* note 9 and *infra* Section V.C for discussion of the earlier offer made to Colman's first attorney, Tom Peterson.

the truthfulness of its key witness but did not directly deny to the jury that a deal had been reached granting him immunity from all pending charges. *See id.* at 980.

**[10]** Minier not only failed to disclose the agreement reached with Colman's counsel, thus contravening *Brady*, but even more significant, he violated *Napue* by allowing Colman to falsely testify that no such deal existed, failing to correct that false testimony, and then wilfully, deliberately and unequivocally falsely representing to the jury in his closing argument that Colman had "never been promised anything for her testimony in this case." In doing so, Minier violated his fundamental obligation to ensure that convictions be obtained in a manner compatible with the "rudimentary demands of justice." *Giglio*, 405 U.S. at 153.

### B.   State Assistance With Respect to Colman's Heroin Arrest

Next, Phillips established through depositions before the district court that, within weeks of her release on bail in 1978, Colman was arrested for participating in the sale of heroin to an undercover Fresno police officer, and that the Madera County Sheriff's Department subsequently made multiple calls to the Fresno police department on Colman's behalf advising it that she was an important cooperating witness in a homicide investigation and requesting that charges against her not be pursued. Ultimately no charges against Colman were filed.

**[11]** That the police officers investigating the Phillips case interceded on Colman's behalf multiple times with respect to an unrelated felony offense was a tangible benefit to Colman in consideration for her testimony against Phillips. The receipt of such a benefit could have been used to impeach Colman's credibility. The state was thus not only obligated under *Brady* to disclose to Phillips that such an intervention had occurred, but also obligated under *Napue* to correct Colman's claim that she had been promised no benefits, along with Minier's asser-

tion that any intimation that she had received such treatment was "sheer fabrication": contrary to these statements, Colman had already received substantial benefits for her testimony in the form of direct assistance that enabled her to escape prosecution for a serious drug-trafficking offense.

The state insists that Minier was unaware of any calls made by the Madera sheriff's department to the Fresno police on Colman's behalf. However, even if true, "[t]he Supreme Court has made abundantly clear . . . that the prosecutor's duty to disclose evidence favorable to the accused extends to information known only to the police." *Jackson v. Brown*, 513 F.3d 1057, 1072 (9th Cir. 2008) (citing *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)). We have thus held that the Constitution "compel[s] prosecutors to disclose evidence favorable to the accused, even when that evidence was known only to the police and not to the prosecutor." *Id.* at 1074; *see also Giglio*, 405 U.S. at 154 (holding that the duty to correct false evidence under *Napue* extends to evidence not known to be false by a particular prosecutor but known to be false by the government). Thus, even if Minier himself did not know about the phone calls made on Colman's behalf—a somewhat dubious proposition—it is immaterial to the state's duty to disclose those phone calls and to correct Colman's false testimony, and Minier's false statements, that she had received no benefits in exchange for her testimony.

The state likewise notes that Colman has testified that she "never had any understanding that there was any connection between her status as a witness in Madera County and her treatment in Fresno County." Brief of Respondent-Appellee at 134. The record reflects otherwise—in particular, the Fresno Police Department officer who investigated Colman's heroin offense testified that Colman knew that the Madera County Sheriff's Department had interceded on her behalf. However, even if, contrary to the testimony of the police, Colman had been unaware of the intercession, and thus did not realize that she provided the jury with misleading testimony when she

stated that she would not receive any benefit in exchange for
testifying against Phillips, her own ignorance of the benefits
she had been granted did not relieve the state of its obligation
to correct her false testimony, nor, certainly, did it make the
prosecution's conduct in deliberately misrepresenting the
facts to the jury and the court any less egregious. *See Hayes*,
399 F.3d at 981.

## C.   Plea Offer to Tom Peterson

The separate *Brady* violation arises out of a plea offer made
to Colman's first attorney, Tom Peterson. Peterson, in state
post-conviction hearings, testified that three weeks after the
murder Minier orally offered him a plea agreement for Col-
man that would have allowed her to plead guilty as an acces-
sory to murder for a one-year sentence if she testified against
Phillips. Peterson further stated that he communicated the
agreement to Colman, who accepted it. Colman disputes that
she accepted the offer, and the state argues that the behavior
of Minier, Colman, and Colman's trial attorney, Dunn, indi-
cates that the offer did not survive the termination of Peter-
son's representation of Colman in February of 1978.[13]
However, the key parties—Peterson, Minier, and Colman—
all appear to be in agreement that such an offer was, in fact,
extended.[14] Its existence was, they acknowledge, never com-
municated to Phillips or his attorney.

---

[13]The state emphasizes, in particular, that there is "no evidence to show
that Dunn was aware of any offer by Peterson to Colman," and argues that
the fact that Minier and Dunn negotiated a new deal for Colman (of which
according to their testimony they did not inform Colman prior to her
appearance as a witness) demonstrates that they did not view the Peterson
offer as binding. Brief of Respondent-Appellee at 117.

[14]Colman testified that Peterson communicated the offer to her but that
she did not accept it, while Minier submitted a 1989 declaration that
appears to accept as true Peterson's assertion that such a plea agreement
was offered, stating: "It was at all times my position, which I clearly com-
municated both to Mr. Peterson and to Cassandra Dunn, who later repre-
sented Sharon Colman, that Colman should not be informed of the
agreement." In a 2003 deposition Minier stated, "I recall discussions, but
I don't recall a fixed agreement [with Peterson]."

**[12]**  That such an offer was extended was indisputably evidence "favorable to the accused . . . because it is impeaching," and was clearly subject to the duty of disclosure established in *Brady*. *See Jackson*, 513 F.3d at 1071 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Evidence of the offer would have allowed Phillips to challenge Colman's credibility by providing the jury with concrete evidence that she had good reason to expect beneficial treatment in exchange for her testimony. Such an expectation of leniency in and of itself would have provided valuable impeachment of Colman's credibility.

**[13]**  Contrary to Phillips's contention, however, the existence of the Peterson offer did not obligate the prosecution under *Napue* to correct Colman's testimony that she had not been promised any benefits. The existence of the offer provided evidence from which a jury could conclude that Colman had testified falsely when she denied expecting any benefit in exchange for her testimony, but because, viewing the facts most generously from the state's standpoint, the offer was never accepted, its existence did not render Colman's testimony inherently false. We therefore hold that the prosecution's failure to divulge the Peterson offer amounted to a violation of its duty under *Brady*, but did not implicate its *Napue* obligation to correct false evidence.

*D.  Prosecutorial Misconduct*

**[14]**  Before proceeding to consider the materiality of the *Napue* and *Brady* violations, we note that the prosecutor's statements in his closing argument that any contention that a bargain had been struck with Colman was "sheer fabrication, just pulled out of the air, totally meaningless" also likely constituted the separate due process violation of prosecutorial misconduct. Unconstitutional prosecutorial misconduct occurs where the prosecutor engages in actions that "so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765

(1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)) (alteration in original). Minier vouched for the credibility of a crucial witness by assuring the jury that Colman had not received any sort of immunity agreement in exchange for her testimony. *See United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005) (finding improper vouching where prosecutor had told the jury in closing arguments that testifying officers had "no reason to come in here and not tell . . . the truth," because by lying they would risk losing their jobs and face possible perjury charges). That Minier's assurances were, in fact, *false* only heightens the extent to which this prosecutorial misconduct violated Phillips's right to due process. Because neither party has expressly raised the issue of whether Minier's representations in his closing argument that no deal with Colman existed constituted prosecutorial misconduct, but both have argued the issue in terms of *Napue*, and because Minier's reenforcement of the false testimony of a key witness is what renders his statements particularly egregious, we consider the statements in terms of a *Napue* violation rather than in terms of prosecutorial misconduct.

### E.   Materiality

**[15]** The prosecution's multiple *Napue* and *Brady* violations warrant reversal of the jury's verdicts only if they were material to (1) Phillips's convictions for first degree murder and attempted murder, (2) his robbery convictions, or (3) the jury's finding that the special circumstance of murder in the commission of a robbery had been proven. The test for materiality under *Napue* is distinct from that under *Brady*: a *Napue* violation is material when there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury," *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added); in contrast, a *Brady* violation is material to a jury's verdict when "there is a reasonable probability that . . . the result of the proceeding *would* have been different" but for the violation, *United States v. Bagley*, 473 U.S. 667,

5812                    PHILLIPS v. ORNOSKI

682 (1985) (emphasis added).[15] Where, as here, the prosecution has violated its constitutional obligations under both *Napue* and *Brady*,

> we first consider the *Napue* violations collectively and ask whether there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." If so, habeas relief must be granted. However, if the *Napue* errors are not material standing alone, we consider all of the *Napue* and *Brady* violations collectively and ask whether "there is a reasonable probability that, but for [the errors], the result of the proceeding *would* have been different." At both stages, we must ask whether the defendant "received . . . a trial resulting in a verdict worthy of confidence."

*Sivak v. Hardison*, 658 F.3d 898, 912 (9th Cir. 2011) (quoting *Jackson*, 513 F.3d at 1076).[16]

---

[15]Because the "Supreme Court has declared a materiality standard . . . for this type of constitutional error, there is no need to conduct a separate harmless error analysis" under *Brecht v. Abrahamson*, 507 U.S. 619 (1993): "the required finding of materiality necessarily compels the conclusion that the error was not harmless." *Hayes*, 399 F.3d at 984 (citing *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

[16]There is no basis for the dissent's assertion that we should require Phillips to show by "clear and convincing evidence" that he was prejudiced by the *Napue* and *Brady* violations. The two cases the dissent cites in support of this proposition — *Sawyer v. Whitley*, 505 U.S. 333 (1992) and *Calderon v. Thompson*, 523 U.S. 538 (1998) — are wholly inapposite. These decisions define the "miscarriage of justice" standard, which, if met, would permit a federal Court of Appeals to recall the mandate to revisit its denial of a state prisoner's habeas petition, *Thompson*, 523 U.S. at 558-59, or to entertain the defaulted or successive petition of a state prisoner claiming he is "actually innocent" of the penalty to which he was sentenced. *Sawyer*, 505 U.S. at 335-36. The miscarriage of justice standard serves to provide a "narrow exception" to the ordinary rules of finality in federal habeas corpus proceedings, representing "a kind of 'safety valve' for the 'extraordinary case.'" *Harris v. Reed*, 489 U.S. 255, 271

In this case, we have found that there are two important facts that the government was obligated to provide to the jury under *Napue*: first, that an immunity agreement had been entered into at the time of Colman's testimony ensuring that no charges whatsoever relating to the events in Chowchilla would be brought against her; second, that the Sheriff's Department had already arranged for charges stemming from a heroin offense committed by her in Fresno to be dropped in order to facilitate her testimony against Phillips. We also consider the prosecutor's deliberate lies regarding the existence of the immunity agreement. For each of the jury's findings, we begin our analysis by examining whether there was "any reasonable likelihood" that the prosecution's *Napue* violations "could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103.[17] If we conclude that there is no reasonable likeli-

---

(1989) (O'Connor, J., concurring). It has no application to a case such as this, in which we consider the non-defaulted claims a state prisoner raised in his first federal habeas petition, claims as to which this court has never rendered a final judgment. *See Phillips*, 267 F.3d at 973-74. In such circumstances, we have, in conformance with Supreme Court precedent, consistently applied the less onerous *Agurs* and *Bagley* standards in determining whether *Brady* and *Napue* violations were prejudicial with respect to "either the guilt or penalty phase" of a state habeas petitioner's trial. *Sivak*, 658 F.3d at 912.

[17]The state contends that Phillips conceded that he was not prejudiced by Colman's testimony. *See Phillips v. Woodford*, 267 F.3d at 985. In fact, in his 2000 brief appealing the district court's denial of an evidentiary hearing in support of his habeas petition, Phillips conceded only the issue of whether he was prejudiced by Colman's failure to divulge the plea offer that Minier had extended to her first lawyer, Peterson. As is explained above, that agreement did not implicate the prosecutor's constitutional obligation under *Napue*, and is therefore not at issue in our analysis of whether the prosecution's *Napue* violations were material. *See supra* Section V.C. Our analysis of the prosecution's *Napue* violations addresses the state's failure to inform the court and the jury both that an immunity agreement with Colman through her lawyer to drop all charges relating to the murder offenses had been entered into, and that Colman had already benefitted from the Madera County Sheriff's Department's assistance with respect to her heroin arrest. It also addresses the prosecutor's deliberate

5814                PHILLIPS v. ORNOSKI

hood that these violations alone could have affected the jury's judgment, we then must ask whether they in combination with the prosecution's failure to disclose to the defense the plea deal offered to Colman's first attorney, Peterson—a *Brady* violation—would satisfy *Brady*'s higher standard of materiality.

We proceed to examine: first, whether the government's *Napue* violations, or, if not, its *Napue* and *Brady* violations together, were material to Phillips's conviction for first-degree murder; second, whether they were material to his convictions for robbery; and third, whether they were material to the jury's special circumstance finding that the murder was committed during the commission of a robbery.

### i. *First-Degree Murder*

**[16]** We hold that the prosecution's *Napue* violations, although "pernicious" and "reprehensible," *Hayes*, 399 F.3d at 981, were not material to Phillips's conviction of first-degree murder. The disclosure of the benefits Colman received in exchange for her testimony could not have had any effect on the jury's determination that Phillips was guilty of the murder of Bartulis. Rose provided extensive testimony identifying Phillips as the culprit, and the prosecution played at trial an audio tape of a phone conversation recorded after

---

lies with respect to the agreement. Phillips did not concede prejudice with respect to these violations. We can, moreover, consider the issue whether the government's failure to divulge the Peterson offer was material regardless of any prior concession by Phillips because the concession was not prejudicial to the state, which continued to develop facts and legal arguments in response to this *Brady* claim. *See United States v. Gabriel*, 625 F.2d 830, 832 (9th Cir. 1980) ("We may consider an issue conceded or neglected below . . . when the party against whom the issue is raised would not be prejudiced and would not have tried his case differently either by developing new facts in response to or advancing distinct legal arguments against the issue."); *Glaziers & Glassworkers v. Custom Auto Glass Dist.*, 689 F.2d 1339, 1342 n.1 (9th Cir. 1982).

Bartulis's murder but before Phillips's arrest in which he
described to his friend Richard Graybill that "a .45 sure did
put a big hole right through him. I mean, it didn't fuck
around." In addition, Phillips's flight to another state and his
effort to conceal his identity provided further significant evi-
dence of his guilt. Thus, even had the government disclosed
the evidence showing that aspects of Colman's testimony and
the prosecutor's statements were false, and had Phillips suc-
ceeded in undermining Colman's credibility, a reasonable
juror, in order to conclude that Phillips was not proven guilty
of murdering Bartulis, would not only have had to disregard
Phillips's recorded statement to Graybill, his flight, and other
post-murder conduct, but would also have had to conclude
that Rose was wrong when he identified the individual who
shot him multiple times, set him on fire and ran him over with
his car, despite the fact that he knew the individual well and
had traveled with him from Fresno to the site of the shooting.
It is unimaginable that the jury could have come to such a
conclusion with or without Colman's testimony, and we
therefore hold that the state's *Napue* violations were not mate-
rial to the jury's finding that Phillips was guilty of Bartulis's
murder.

[17] Although whether the state's *Napue* violations were
material to the jury's finding that Phillips had *premeditated*
Bartulis's murder is a closer question, we hold that the evi-
dence of premeditation the prosecution presented was suffi-
ciently powerful and abundant that there is not a "reasonable
likelihood" that the prosecution's failure to correct Colman's
testimony, and its deliberate falsehood in telling the jury that
there was no agreement, could have affected the jury's judg-
ment that Phillips premeditated the murder.[18] Again, with or

---

[18]A finding that Phillips had premeditated Bartulis's murder was one of
two possible grounds on which Phillips could be found guilty of first
degree murder, with the other ground being felony murder. The jury, how-
ever, made a special finding that Phillips had premeditated Bartulis's mur-
der, and we presume here that this finding was the basis for its verdict that

without Colman's testimony, the jury's conclusion would undoubtedly have been the same. The prosecution pointed out: that Phillips sought to manufacture an alibi by flying to his mother's house in Sacramento prior to driving to Fresno, rather than simply flying to Fresno directly; that Phillips lured Rose and Bartulis to an isolated remote lot, far from his hometown where he might have been a suspect for the shootings; that Phillips asked Rose for matches when the two cars stopped en route to the vacant lot, suggesting that Phillips intended in advance to set the victims and their car on fire in order to conceal their identities;[19] and that Phillips told Rose and Bartulis that the stolen insulation was going to be supplied by his brother even though Phillips does not have a brother, and no insulation was ever produced. The state also presented evidence that Phillips methodically attempted to hide his role in the murder, not only by concealing his victims' identities by pouring gas on them and lighting them on fire after shooting them, but also by removing the bullet shell casings from the scene after the shooting.

[18] The prosecution did offer Colman's testimony to augment its case that the murder had been premeditated. Colman's statement that Phillips had pulled a gas can out of the trunk of his mother's car supported a finding of premeditation

---

Phillips was guilty of murder in the first degree. Because we hold that the prosecution's *Napue* and *Brady* violations were not material to the jury's determination that Phillips premeditated Bartulis's murder, we need not consider whether Phillips could have been convicted of first-degree felony murder. In any event, a finding of premeditation is necessary to the determination in this case that special circumstances existed that rendered Phillips death-eligible. *See* Cal. Penal Code § 190.2(c)(3) (Deering 1978). As the judge instructed the jury with respect to special circumstances, the jury must find that the "murder was wilful, deliberate and premeditated, and was committed during the commission or attempted commission of Robbery.".

[19]In contrast to his testimony at the penalty-phase retrial, Rose did not explain at the initial trial that he gave Phillips a marijuana cigarette along with the matches.

in light of Phillips's mother's testimony that she did not ordinarily keep a gas can in the car. Likewise, the prosecution sought to demonstrate Phillip's cold-blooded manner by highlighting Colman's testimony that Phillips struck Rose and Bartulis in the head after shooting them, which buttressed the testimony of the doctor who treated Rose that Rose had a wound "that was probably due to a blow on the head." Given the extensive evidence of planning, however, and of the methodical manner in which the murder was committed, there is not a "reasonable probability" that, had the jury learned of the benefits Colman had received and of the prosecutor's deliberate falsehood as to the immunity agreement, it might have found that there was a reasonable doubt as to whether Phillips had premeditated the murder. We therefore conclude that the prosecution's Napue violations were not material to the jury's conclusion that Phillips premeditated Bartulis's killing, or to its attendant conclusion that Phillips was guilty beyond a reasonable doubt of first-degree murder.

Having found that the *Napue* violations were not, standing alone, material to Phillips's first-degree murder conviction, we must consider the *Napue* violations collectively with the *Brady* violation, asking whether "there is a reasonable probability that, but for [the state's violations], the result of the proceeding *would* have been different." *Jackson*, 513 F.3d at 1076 (citations and quotation marks omitted). As is explained above, the only piece of evidence in this case that was subject to disclosure under *Brady* but not *Napue* was the fact that prior to trial, while still represented by her first attorney, Colman had received a plea offer that would have limited her jail sentence to one year. Because Colman's testimony was not material to the conviction on the first-degree murder count, this additional violation is of no consequence.[20]

---

[20]For the same reasons that the prosecution's violations of *Napue* and *Brady* were not material to Phillips's conviction for first degree murder of Bartulis, they were not material to his conviction on the count of attempted murder of Rose.

PHILLIPS v. ORNOSKI

### ii.   Robbery

**[19]** We likewise hold that the prosecution's *Napue* and *Brady* violations were not material to Phillips's convictions for the robberies of Rose and Bartulis. California law defines "robbery" as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal. Penal Code § 211 (Deering 1977). The only items that Phillips was alleged to have taken from the persons or presence of Rose and Bartulis were their wallets and Rose's gun.[21] Rose testified directly that Phillips had taken his wallet, and the jury had no reason not to credit his testimony. Although Colman's testimony was the primary direct evidence that Phillips took Bartulis's wallet, substantial circumstantial evidence supported Phillip's conviction for this crime, including his attempt to destroy the car and the bodies inside it. The only plausible explanation of the occurrences on December 7, 1977 is that if Phillips took one wallet he took them both; no rational explanation would support taking one but not the other. Given all of the circumstances present in this case, we cannot conclude that the jury's verdict that Phillips was guilty of the robberies "could" have been different but for the prosecution's *Napue* violations, nor that it "would" have been different but for the prosecution's *Napue* violations and its additional *Brady* violation.

### iii.   Special Circumstance Finding

We turn now to the question whether the prosecution's *Napue* violations were material to the jury's special circumstance finding that Bartulis's murder was committed during

---

[21]Phillips would be guilty of robbery regardless of his motive in taking these items. It is not a necessary element of robbery that "the taking be for the purpose of gain." *People v. Green*, 609 P.2d 468, 503 (Cal. 1980). Thus, Phillips's taking of the wallets and gun in order to conceal his victims' identities would warrant his conviction for robbery.

the commission or attempted commission of a robbery, a finding that was a necessary prerequisite to Phillips's being eligible for the death penalty. We hold that the violations *were* material to that finding.

[20] To prove that Phillips murdered Bartulis "during the commission" of a robbery or attempted robbery, the state bore the burden of proving beyond a reasonable doubt not just that Phillips had taken the property of Rose or Bartulis unlawfully, but that Phillips had the independent purpose of robbing Rose and Bartulis when he lured them to the lot in Chowchilla. Under the special circumstance statute that was applied at Phillips's trial, the jury was required to make two findings: first, that Phillips was guilty of the underlying offense of attempted or completed robbery; second, that the murder had been committed "in order to advance an independent felonious purpose" of robbery. *Green*, 609 P.2d at 505 (interpreting Cal. Penal Code § 190.2(c)(3) (Deering 1978)); *see also People v. Morris*, 756 P.2d 843, 854 (Cal. 1988). In *Green*, the California Supreme Court held that the "goal" of the special circumstance statute "is not achieved . . . when the defendant's intent is not to steal but to kill." 609 P.2d at 505.[22] *Green* illustrates the distinction between a robbery that is merely a "second thing to" a murder and murder committed in order to advance the felonious purpose of robbery. *Id*. In *Green*, the defendant, before killing his wife, took her clothes, ring and purse in order to conceal her identity when her body was found. *Id.* at 501. The court held that there was sufficient evidence to find the defendant guilty of robbery. *Id.* at 503. It then held, however, that the special circumstance of murder during the commission of a robbery had not been proven because the murder and the taking of property "was not . . . a murder in the commission of a robbery but the exact opposite, a robbery in the commission of a murder." *Id.* at 505.

---

[22]*Green* continues to serve as the controlling case with respect to the special circumstance issue, despite the statute's subsequent amendment. *See especially People v. Abilez*, 161 P.3d 58, 87 (Cal. 2007).

Here, likewise, proof that Phillips had robbed his victims was not enough: the state bore the burden of proving beyond a reasonable doubt that the robbery was a motivating purpose of Phillips's criminal actions, that Phillips had led his victims to an isolated location and shot them *because*, inter alia, he intended to rob them. In the words of the California Supreme Court, the prosecution's obligation was to prove beyond a reasonable doubt that what occurred in Chowchilla was a "murder in the commission of a robbery, [not] the exact opposite, a robbery in the commission of a murder." *Id.*

**[21]** Considerable evidence in the record suggests that Phillips had not, in fact, orchestrated the events of December 7, 1977 for the purpose of robbing Rose and Bartulis, i.e., that the murder was not committed in order to further the robbery, but rather that the robbery was incidental to the murder. For example, although Rose testified that Phillips told him to bring as much cash as possible to the putative insulation deal, there is no evidence that Phillips ever followed up on this request or otherwise attempted to confirm that Rose planned to or actually brought cash, despite the fact that, as Rose testified, he had told Phillips over the preceding month that he was experiencing financial difficulties that limited his access to funds. Similarly, the evidence at trial indicated that after shooting Rose and Bartulis, Phillips did not search them thoroughly; rather, he conducted a search of Rose so cursory that he failed to find the wad of bills totaling $3,500 – $5,000 that Rose had placed in his jacket's breast pocket,[23] and did not enter the truck to search either Rose or Bartulis. As Phillips's attorney, Martin, repeatedly pointed out to the jury, these facts are inconsistent with the notion that Phillips committed murder in order to further a scheme to rob Rose and Bartulis. One would generally expect an individual who, for the purpose of robbing his victims had elaborately planned a double murder,

---

[23]Phillips also failed to take approximately $162 from Rose's pants pocket, a fact disclosed in the filed police reports of the incident introduced at pre-trial proceedings but not brought before the jury.

PHILLIPS v. ORNOSKI                    5821

developed an alibi, flown from Orange County to Sacramento, driven from Sacramento to Fresno, and shot two men, to, at the very least, confirm that they had or had not brought cash with them, instead of setting their bodies on fire and leaving the scene with only the minimal funds contained in their wallets and without conducting a thorough search of their persons or vehicle. As Martin noted at the conclusion of his closing argument, "this would be a stupid way to plan a robbery, taking potluck [sic] on what you might get, if anything," and, we might add, without even seriously looking for the intended proceeds.[24]

[22] Given the minimal evidence that the government presented in support of its theory that Phillips lured Rose and Bartulis to Chowchilla in order to rob them, Colman's testimony was essential to the prosecution's special circumstance case.

---

[24]The dissent contends that the evidence establishing that Phillips told his victims to bring money, shot them, and took their wallets "overwhelmingly supported the conclusion that Phillips possessed the intent to rob these men." Dis. op. at 5841. Our colleague relies on the California Supreme Court's dictum in *People v. Marshall,* 931 P.2d 262 (Cal. 1997). In *Marshall,* the Court first found that no robbery had occurred at all — the defendant took only an insignificant piece of paper. *Id.* at 280. The Court then commented by way of dictum that if a wallet is taken after a murder a jury "may reasonably infer" that the murder was committed for the purpose of obtaining money, provided that the evidence establishing this motive is "reasonable, credible and of solid value." *Id.* A jury may also, however, reasonably infer to the contrary where the evidence is not such as to require the conclusion that the defendant necessarily committed the murder in furtherance of a robbery, including where there is evidence suggesting other motives for the murder, or where some of the prosecution's evidence is revealed to be false. *Marshall*'s hypothetical does not include any of the facts present in this case that would negate the inference that the murder was committed for the purpose of robbing the victims. Moreover, *Marshall*'s dictum speaks only to what evidence might be legally sufficient for a jury to find true the special circumstance allegation, not to what evidence would leave no "reasonable probability" that the jury "could" have reached the opposite conclusion if statements made by the prosecution and a key witness were revealed to be false. *See Agurs,* 427 U.S. at 103; *Sivak,* 658 F.3d at 917-18.

Especially crucial to that case, and emphasized in its closing argument, was Colman's testimony that, when Phillips returned to his car after the shooting, and then again while driving back to Fresno from Chowchilla, he told her that he was "disturbed" by the absence of the money he had asked Rose to bring, and complained about his failure to find any cash. Also integral was Colman's testimony that Phillips had searched Rose extensively for the money, which was otherwise uncorroborated (Rose testified only that he felt hands "moving [him] around such as searching [his] pockets," but did not testify as to the duration or thoroughness of these actions). Colman's testimony "was not only the prosecution's most specific evidence" regarding Phillips's intent to rob Bartulis and Rose, "it was also the most powerful." *Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005). As the prosecution stated when it appeared that Colman might not be available to testify during Phillips's penalty-phase retrial, "[If] Miss Colman declined to show up, I don't even know if we can proceed. . . . Without her testimony, we have about half a case. If she didn't show up, I think we would re-evaluate our case."

   **[23]** Were Colman's testimony discredited as a result of the revelation of her false testimony and her motivation for lying, the jury could and likely would have concluded that the theft of the wallets, or any minimal unsuccessful attempt to steal any other cash on Rose's person, was simply a "second thing to" the murder, and thus not a special circumstance under California law. Had the defense been able to impeach Colman and cross-examine her regarding her false testimony and her secret deal, the jury might well have concluded that in planning the murder Phillips was motivated by unrelated purposes, such as to cover up his prior narcotics dealings with Rose and Bartulis and to prevent them from double-crossing him, as Colman told the investigators prior to the deal but never told the jury.[25] Alternatively, the jury might have con-

---

[25]Minier's secret deal with Colman's attorney may have had just the sort of pernicious effect that led us to condemn this tactic in *Hayes*:

cluded that Phillips was motivated by a desire to retain the payments Rose and Bartulis had already made to him — the prosecution itself repeatedly argued for this motivation at trial, observing that "if he killed Mr. Rose and Mr. Bartulis, he'd not only have the $11,500 [Rose and Bartulis had initially given him in cash], but he would have a note for an additional $25,000."[26] The evidence presented at trial, apart from Colman's testimony, was entirely consistent with each of these alternative motivations, and offered little if any support for the theory that Phillips's reason for luring Rose and Bartulis to Chowchilla was to rob them, and that the murder was in furtherance of that objective: Phillips may have told Rose to bring money with him to the putative insulation deal in order to render the existence of that deal more believable to Rose, and he may have taken his victims' wallets in order to conceal their identities (an interest he also furthered by setting their car on fire). There were, indeed, various possible

---

namely, it may have induced changes in Colman's testimony. *See* 399 F.3d at 981 n.1. During a lengthy December 28, 1977 interview conducted the day after she turned herself in to the police, Colman stated that Phillips's only apparent concern after the shooting was his belief that Rose may not have been killed. Colman said that Phillips told her he shot Rose and Bartulis not out of any desire to rob them, but rather because he was concerned that Rose and Bartulis were setting him up, might double-cross him, and knew too much about his cocaine dealings. It was not until Colman's subsequent January 4, 1978 interview with the police that, after very specific prompting from investigators, Colman changed her story and said that Phillips had been disappointed about having been unable to find Rose's money. Disclosure of the benefits that Colman received for testifying would have allowed Phillips's attorney to argue to the jury that the development of Colman's inconsistent account—from her initial statements that Phillips was motivated by a concern that Rose and Bartulis were setting him up, might double-cross him, and knew too much, to her testimony at trial that Phillips appeared concerned primarily with his inability to find Rose's cash—occurred in direct response to the state's inducements.

[26]Phillips's retention of these funds would not, of course, constitute a "robbery" under California law because he did not take these amounts from the "person or immediate presence" of Rose or Bartulis. *See* Cal. Penal Code § 211 (Deering 1977).

explanations for why the murder took place, but only Colman's testimony purported to provide an explanation offered by Phillips himself, one that served as the foundation for the jury to find that the special circumstance had been proved.

Disclosure of either Colman's secret deal or the assistance she received with respect to her heroin arrest would have allowed Phillips's counsel to impeach and discredit a witness whose testimony was absolutely crucial to the state's special circumstance case. As we explained in *Hayes*, and as is equally true here:

> The jury was not permitted to assess whether [the critical prosecution witness] had an expectation of favorable treatment that could have affected [her] testimony because the State affirmatively placed false evidence before the jury that there was no deal. . . . If [the witness] had known of the secret deal and had testified about it [s]he would have been subject to impeachment—not only on the existence of the favorable deal, but also on the State's attempts to keep the deal from the jury. The State could not have falsely buttressed [her] credibility before the jury. Thus, the violation of *Napue* was material.

399 F.3d at 987-88.

The district court came to a contrary determination regarding the materiality of the state's violations of its constitutional obligations by concluding that Colman's credibility was sufficiently put before the jury by Phillips's counsel, Martin. The dissent also embraces this reasoning. Martin introduced evidence that Colman had been released on her own recognizance and had received an unusual number of continuances, and repeatedly intimated that Colman had negotiated some sort of deal with the prosecution. But as we explained in *Benn v. Lambert*, 283 F.3d 1040 (9th Cir. 2002), "In cases in which the witness is central to the prosecution's case, the defen-

dant's conviction indicates that in all likelihood the impeach-
ment evidence introduced at trial was insufficient to persuade
a jury that the witness lacked credibility. Therefore, the sup-
pressed impeachment evidence . . . takes on even greater
importance." *Id.* at 1055. Here, hard evidence that a deal had
actually been agreed upon that would allow Colman to escape
prosecution would have had far more persuasive force than
Martin's assertions, wholly unsupported by any evidence, that
such a deal might have existed, especially in light of the pros-
ecution's sarcastic and false dismissal of Martin's suspicions
as "sheer fabrication." *See Jackson*, 513 F.3d at 1077
("[A]lthough the witness had been cross-examined about his
own attempts to benefit from his cooperation, evidence of an
explicit promise of assistance by the trial prosecutor likely
would have carried far greater weight than any speculative
benefit [the witness] might have thought he could achieve on
his own." ). "The disclosure of a . . . secret deal would not
have been merely cumulative impeachment," because "[i]t
would have demonstrated that the State was going to great
lengths to give [Colman] a powerful incentive to testify favor-
ably, to the point of letting [her] go free on" capital murder
charges. *Hayes*, 399 F.3d at 987.

**[24]** In sum, Colman's testimony and credibility were criti-
cal to the success of the prosecution's argument that Phillips
lured Rose and Bartulis to Chowchilla with the independent
purpose of robbing them, and that the robbery was not merely
incidental to the murder, contrary to what the bulk of the evi-
dence other than Colman's testimony suggested. The false
testimony by Colman that she had received no promise of
benefits in exchange for her testimony—which, in violation of
*Napue*, the prosecution not only failed to correct but also
affirmatively and falsely reinforced before the jury—directly
implicated Colman's credibility, and was far more powerful
than all the innuendo and speculation that Phillips's counsel
was able to offer. Because Phillips was denied a fair opportu-
nity to impeach the credibility of a witness whose testimony
was essential to the jury's special circumstance finding, we

5826                    PHILLIPS V. ORNOSKI

conclude that there is "a reasonable likelihood that the false testimony could have affected the judgment of the jury," *Agurs*, 427 U.S. at 103, with respect to the finding that Bartulis's murder occurred during the commission of a robbery. Even were the standard that which is applicable for a *Brady* violation, we would hold that there is a "reasonable probability" that the jury's special circumstance finding "would have been different" but for the state's violations. *Bagley*, 473 U.S. at 682. Accordingly, we conclude that the state's multiple violations of *Napue* were material to the special circumstances finding and thus deprived Phillips of his right to due process. That finding must therefore be vacated.**[27]** So, too, must the death penalty sentence that resulted from that finding, as without the special circumstance determination Phillips would not have been death-eligible. *See Green*, 609 P.2d at 514 ("[B]ecause . . . the special circumstances findings must . . . be vacated, the punishment of death likewise cannot stand under the statute.").

## VI.   Conclusion

**[25]** We conclude that the district court did not abuse its discretion in its conduct of the evidentiary hearings below, and affirm its holding that Phillips's trial counsel was not ineffective, as well as its holding that the prosecution's *Brady* and *Napue* violations were not material to Phillips's first-degree murder conviction, his attempted murder conviction, or his robbery convictions. We reverse, however, the district court's holding that the prosecution's *Napue* violations were not material to the jury's special circumstances finding. Accordingly, we reverse and remand to the district court with instructions to grant a conditional writ of habeas corpus. The state may either grant Phillips a new trial on the special cir-

---

**[27]**Because we find that the *Napue* errors alone compel vacation of the special circumstances finding, we do not reach the materiality of the prosecution's *Brady* violation, specifically the failure to disclose the plea offer made to Colman's first attorney, Peterson.

cumstance allegation within ninety days or sentence him to a penalty other than death in conformance with state law. *See, e.g.*, *People v. Horton*, 906 P.2d 478, 484 (Cal. 1995).

**AFFIRMED**, in part, **REVERSED**, in part, and **REMANDED**.

---

KLEINFELD, Senior Circuit Judge, concurring in part and dissenting in part:

Phillips murdered Bruce Bartulis at a vacant lot in 1977. He did his best to also murder Bartulis's companion, Robert Rose. He shot Rose five times with a .45, poured gasoline on him, set him on fire with matches he had borrowed from Rose himself when they had stopped at a gas station (even though Phillips was a non-smoker), and ran him over with a car. Phillips had told Bartulis and Rose, falsely, that he was going to make them a lot of money if they gave him $25,000 to buy cocaine for sale, and then told them he was going to sell them a lot of stolen insulation (they were builders). He did not have $25,000 worth of cocaine and did not have the stolen insulation. He told them to bring with them all the money they could get together, and to follow him to the deserted location he picked. After he shot them both, he took their wallets, picked up the brass from his cartridges, and went on the lam under a false name.

Rose amazingly survived the five bullets Phillips shot into his head, stomach, and arm, survived being set on fire, and survived being run over. He was the star witness against Phillips at trial, testifying to the events of the murder and attempted murder, and to the dealings leading up to them. Phillips's then-girlfriend, Sharon Colman, who was present at the crime scene, testified to what Phillips had told her and what she had seen. The jury heard a tape recording of a phone call Phillips made to his childhood friend Richard Graybill, in

which he bragged about how his ".45 sure did put a big hole right through him," referring to one of his victims. Phillips's mother testified to the time of his arrival home the night of the murder, which impeached Phillips's perjured alibi testimony. Before trial, Phillips had gone so far as to put out contracts to kill old friend Graybill, former girlfriend Colman, survivor Rose, and even Phillips's own mother, but they also failed to die on his schedule. The jury viewed as evidence the letter Phillips wrote to the hit man, providing descriptions, habits, and residences for his intended victims.

Phillips insisted on testifying at trial, claiming he was not even there when the murder occurred, having been at a "business meeting" elsewhere at the time. He has since admitted this testimony was a lie, and that he was in fact at the scene of the crime. But Phillips insisted on the alibi at trial. Phillips's counsel argued that Graybill must have been the murderer. He showed there was a high likelihood that Colman and Graybill were getting freedom or lenience in exchange for testimony satisfactory to the prosecution, so they had good reason to testify favorably for the prosecution, truthfully or not. He even managed to come up with an argument for why Rose, the victim, might be lying.

Phillips's counsel also explained to the jury that even if Phillips had committed the murder and attempted murder, the jury should not find the "special circumstance" to be true.[1]

_____

[1]Cal. Penal Code § 190.2(a)(17)(A) ("The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found . . . to be true . . . The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit . . . Robbery . . . ."; Cal. Penal Code § 190.4(a) ("In case of reasonable doubt as to whether a special circumstance is true, the defendant is entitled to a finding that it is not true."); *see also Pulley v. Harris*, 465 U.S. 37, 51-53 (1984) (rejecting constitutional challenge to this sentencing scheme and

The special circumstance in this case was that "the murder [of Bartulis] was committed while [Phillips] was engaged in the commission or attempted commission of a robbery."[2] Phillips's counsel skillfully wove his special circumstance argument into the alibi theory, a challenging task. He gave a reason why Phillips had an interest in keeping Bartulis and Rose alive, that it would not make sense to kill the goose who was about to lay the $25,000 egg. It is hard to argue persuasively to a jury that "my client wasn't even there and didn't do it, but if he did, his purpose wasn't robbery," but counsel figured out a way to keep the special circumstance issue in the case as a potential barrier to the death penalty.

Now the majority vacates the jury's special circumstance

explaining, "Under [California's] scheme, a person convicted of first degree murder is sentenced to life imprisonment unless one or more 'special circumstances' are found, in which case the punishment is either death or life imprisonment without parole. Special circumstances are alleged in the charging papers and tried with the issue of guilt at the initial phase of the trial. At the close of evidence, the jury decides guilt or innocence and determines whether the special circumstances alleged are present. Each special circumstance must be proved beyond a reasonable doubt. If the jury finds the defendant guilty of first degree murder and finds at least one special circumstance, the trial proceeds to a second phase to determine the appropriate penalty. Additional evidence may be offered and the jury is given a list of relevant factors. After having heard all the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole. If the jury returns a verdict of death, the defendant is deemed to move to modify the verdict. The trial judge then reviews the evidence and, in light of the statutory factors, makes an independent determination as to whether the weight of the evidence supports the jury's findings and verdicts. The judge is required to state on the record the reasons for his findings. If the trial judge denies the motion for modification, there is an automatic appeal." (citations, brackets, and quotations omitted)).

[2]California Jury Instruction—Criminal ("CALJIC") No. 8.81.17; Cal. Penal Code § 190.2(a)(17)(A).

5830                    PHILLIPS v. ORNOSKI

finding, speculating that if only the jury had been able to find
out more about the inducements to Colman, the girlfriend, to
say what the prosecutor wanted, the jury might have con-
cluded that the murder was motivated by purposes other than
robbery. The majority speculates that Phillips might have shot
Bartulis and Rose to cover up Phillips's prior dealings with
them, or to prevent them from double-crossing him, or to
retain the payments Bartulis and Rose had already made to
him. These theories were unsupported by any evidence at
trial. Even if the jury had decided Colman was not worthy of
belief (it may well have, because she was effectively
impeached and her motivation to testify was brought painstak-
ingly before the jury), Colman's alleged perjured testimony
could not have affected the verdict. The evidence of an intent
to rob by killing came from facts not dependent on anything
Phillips's girlfriend said.

   The purpose of robbery was proved by overwhelming evi-
dence. Rose testified that Phillips instructed him to come up
with as much cash as he could get, that Phillips lured the men
to a deserted location, shot them, then took their wallets. The
jury also learned of Phillips's motive to rob. He lived in a
$600,000 Newport Beach beachfront house ($600,000 in 1977
dollars), drove an expensive sports car, flew about in private
planes, and dated a beautiful young woman, despite having no
money and needing to borrow $125 from his mother the day
after the murder. If the jury had the slightest doubt that Phil-
lips would murder in cold blood just to get some cash, their
doubts would have been allayed by the proof that he put out
a "contract" on his girlfriend, his old friend, his surviving vic-
tim, and even his own mother.

   The majority concludes that none of the prosecutorial mis-
conduct could have made any difference to whether the jury
would have found Phillips guilty of attempted murder, first-
degree murder, and robbery, and that defense counsel was not
constitutionally ineffective. I concur in those conclusions. I
also concur in the characterization of prosecutorial miscon-

duct. I do not concur in the attacks on defense counsel's assistance. The reasons appear more fully in my previous dissent, found at, *Phillips v. Woodford*, 267 F.3d 966, 988 (9th Cir. 2001) (Kleinfeld, J., dissenting). Defense counsel appears from the record to be a very fine lawyer who did an excellent job for Phillips. The majority now concedes that under *Cullen v. Pinholster*,[3] defense counsel was not constitutionally ineffective, overruling its holding to the contrary in *Phillips v. Woodford*.[4] I dissent from the portion of the majority's opinion vacating the jury's special circumstance finding that the murder of Bartulis was "committed during the commission or attempted commission of a robbery."

Phillips was sentenced to death in 1980. Since then he has evaded his sentence by means of more than three decades of additional litigation. And now he succeeds again, on the meritless claim adopted by the majority that had the jury been aware of additional impeachment evidence as to the girl-friend's motivation for testifying, it might have reasonably concluded that the robbery was merely incidental to the murder.

The majority appropriately labels the prosecutor's tactics in this case as deplorable, but as the United States Supreme Court has expressly directed:

> We do not [ ] automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . . A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury.[5]

---

[3]*Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1406-07 (2011).

[4]*Phillips v. Woodford*, 267 F.3d 966, 980 (9th Cir. 2001).

[5]*Giglio v. United States*, 405 U.S. 150, 154 (1972) (citations and quotations omitted).

Thus, it is not enough to find constitutional error. Instead, the court is required to consider all of the evidence and determine whether the false evidence was material to the jury's judgment.[6]

The "any reasonable likelihood" of an effect on the jury standard applies to direct appeals. This is not a direct appeal. This is a habeas proceeding, best characterized as a second or successive habeas proceeding. Probably the correct standard is that a federal court cannot grant relief unless the evidence is "clear and convincing" that, had the Colman deal been disclosed to defense counsel and the jury, "no reasonable juror would have found him eligible for the death penalty."[7] Like the petitioner in *Calderon v. Thompson*, Phillips's false alibi was "devastating to his defense,"[8] under any standard.

Because this is a habeas proceeding, we are constrained not only by the requirement of prejudice, but also by the requirement of deference to the state courts. Phillips was convicted and sentenced in state court. On direct appeal, the California Supreme Court carefully weighed the prejudicial effect of the prosecutor's wrongful nondisclosure of the deal between the prosecutor and the girlfriend's lawyer. The Court found, and the transcript fully supports its finding, that "the jury was made well aware of the possible impact of Colman's expecta-

---

[6]*See also Smith v. Cain*, 565 U.S. ___, 132 S. Ct. 627, 630 (2012) ("We have observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict.").

[7]*See Sawyer v. Whitley*, 505 U.S. 333, 350 (1992) (holding petitioner is required to "show by clear and convincing evidence that but for constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty"); *Calderon v. Thompson*, 523 U.S. 538, 560 (1998) ("To the extent a capital petitioner contests the special circumstances rendering him eligible for the death penalty, the *Sawyer* 'clear and convincing' standard applies, irrespective of whether the special circumstances are elements of the offense of capital murder or, as here, mere sentencing enhancers.").

[8]*Calderon v. Thompson*, 523 U.S. 538, 561 (1998).

tion of leniency on her credibility."[9] The California Supreme Court further noted, after thorough discussion of the evidence, that "the key witness against defendant was Ronald Rose," his testimony was well-corroborated, the evidence against Phillips was "overwhelming," and the jury's verdict "a foregone conclusion":[10]

> While the defense should have been given a fuller opportunity to discover evidence that might have permitted a stronger attack on Colman's credibility, closing arguments on both sides demonstrate that the jury was made well aware of the possible impact of Colman's expectation of leniency on her credibility. The prosecutor noted that "it wouldn't make any sense if she came in here and testified unless she were hoping for consideration . . . that's why she's testifying." Defense counsel emphatically brought home to the jury the potentially coercive effect of the prosecution's tactics, declaring that "they're holding a murder charge over her head to testify, and she's singing like a bird, the tune that they call." In this situation, the jury could properly assess Colman's credibility even without testimony on a specific agreement between her attorney and the prosecution.

> Furthermore, the evidence against defendant with respect to the charged offense was overwhelming. While Colman was an important prosecution witness, the key witness against defendant was Ronald Rose, the victim who miraculously survived despite being shot, set on fire and run over by a car. Given Rose's testimony, and the considerable amount of corroborating evidence, the jury verdict as to guilt and the special circumstance allegation was virtually

---

[9] *People v. Phillips*, 41 Cal. 3d 29, 48 (1985).
[10] *Id.* at 49.

a foregone conclusion. Under the circumstances, there was no prejudice to the defendant.[11]

In addition, the Superior Court of California, County of Madera, in its order denying Phillips's writ of habeas corpus, made factual findings and concluded, "Clearly [Colman's] credibility because of a 'deal,' and a pending murder charge was put before the jury, and, as stated by the Supreme Court, the jury had sufficient facts with which to evaluate Sharon Colman's testimony." The federal district court also concluded in a thorough sixty-one page order denying Phillips's federal habeas petition that any constitutional errors at trial could not have reasonably affected the judgment of the jury, because of the overwhelming evidence against Phillips other than Colman's testimony.

The majority rejects the conclusion of every other court to have addressed this case. "This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law."[12] Even assuming "any reasonable likelihood" of an effect on the jury is the correct standard, this Court is still required to presume the correctness of state court factual findings,[13] and to review the findings of the district court for clear error.[14] The majority disregards these standards, and

---

[11]*Id.* at 48-49.

[12]*Woodford v. Visciotti*, 537 U.S. 19, 23 (2002) (per curiam) (citing pre- and post- AEDPA authority, and reinstating capital sentence for California prisoner convicted of first-degree murder, attempted murder, and armed robbery).

[13]*Sumner v. Mata*, 455 U.S. 591, 591-92 (1982) ("28 U.S.C. § 2254(d) requires federal courts in habeas proceedings to accord a presumption of correctness to state-court findings of fact"); *id.* at 592-93 ("the presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact"); *id.* at 595 n.5 (noting rule applies to state court findings of fact on direct appeal and in state habeas proceedings).

[14]*Jackson v. Brown*, 513 F.3d 1057, 1069 (9th Cir. 2008) ("The district court's factual findings are reviewed for clear error. We therefore accept its findings absent a firm conviction that a mistake has been committed." (internal quotations omitted)).

instead takes upon itself the role of a jury of two, in an imaginary trial that never occurred.

I need not base my dissent on the precise standard applicable to the constitutional error, limitations of our habeas authority, or our duty of deference to state court findings and the presumption of their correctness. The question of how, precisely, to formulate the standard is quite complex. Should Phillips have been permitted to raise his new argument at all, after his many past proceedings? Should the petition raising the new argument be treated as pre-AEDPA or post-AEDPA?[15] To what extent may the state findings be viewed as mixed questions of fact and law? Did we have authority to direct the district court to take new evidence, evidence not before the state courts? Do we have authority to grant a petition based on evidence so obtained? Should the proper standard for us be whether Phillips has offered "clear and convincing" evidence that "no reasonable juror" would have found him to be subject to the robbery special circumstance, had the jury known of the prosecutor's deal with the girlfriend's lawyer? These complex questions need not be answered because no matter what, precisely, our proper standard and our deference obligation to the state courts may be, the result would be the same. Even were we reviewing directly, as though we were a state supreme court, we would have to reach the same conclusion as the California Supreme Court reached in this case.

I assume for purposes of discussion that the standard most favorable to Phillips applies. That standard is whether there is any reasonable likelihood that the arguably false testimony Colman gave "could have" affected the judgment of the jury on the special circumstance finding. The majority concedes that "[i]t is unimaginable" that the jury could have reached a different verdict on the first-degree murder charge, despite the

---

[15]*See Phillips v. Woodford*, 267 F.3d 966, 989 (9th Cir. 2001) (Kleinfeld, J., dissenting) (noting Phillips filed his petition after the AEDPA went into effect).

prosecutor's wrongdoing. Likewise "[i]t is unimaginable" that the jury could have reached a different conclusion as to the special circumstance of the murder occurring "during the commission of a robbery." Had the jury been fully informed of the prosecutor's agreement with Colman's lawyer, and that she had escaped prosecution on unrelated charges, it would have made no difference to the verdict. The jury was well-informed of the reasons for skepticism about her testimony. Colman candidly admitted at trial that she expected the prosecution to take her willingness to cooperate into consideration. The prosecutor admitted during his closing argument that Colman was an accomplice who expected leniency, and her testimony should be viewed with distrust:

> She also testified that she was hoping for consideration, and that is only understandable; as a matter of fact, it wouldn't make any sense if she came in and testified unless she were hoping for consideration. Naturally, she's hoping for consideration. Naturally, she's hoping for leniency. And it only seems reasonable that she would hope and anticipate that she would be treated leniently, and, of course, that's why she's testifying. And, of course, that's why her attorney told her to cooperate and to testify. But it doesn't mean she's lying.

> . . . . Under the law it is true that Miss Colman is what's called an accomplice . . . . That means that you really stand back and you look at it and you decide, now, is this girl really telling the truth . . . . You have to have what's called corroboration; in other words, the Defendant could never be convicted on the testimony of Miss Colman alone.

The judge then instructed the jury that Colman was an accomplice and that her testimony should be viewed with distrust:

> . . . Sharon Colman was an accomplice . . . . The testimony of an accomplice ought to be viewed with

distrust. This does not mean that you may arbitrarily
disregard such testimony, but you should give to it
the weight to which you find it to be entitled after
examining it with care and caution and in the light
of all the evidence in the case.

The jury did not need Colman's testimony, that Phillips was
disappointed in how little money he got, to conclude that the
murders were committed "during the commission of a rob-
bery." Indeed, she did not even say that robbery was Phillips's
purpose. Phillips probably lost his own case by lying to the
jury, and Rose certainly established the state's case with his
powerful and highly credible testimony. Colman was not the
critical witness for the robbery special circumstance finding.
Rose was.

Rose, the miraculously surviving victim, testified that Phil-
lips "told me to get as much cash together as I could and what
time to meet him and where to meet him in Fresno; that was
early in the morning on the 7th." That night, Phillips led Rose
to a remote location and shot him five times. Rose testified
that he then felt "someone moving me around such as search-
ing my pockets" and that he heard "a male voice" next to him
while his pockets were being searched. Although Phillips took
Rose's wallet, which was in his rear pocket, Phillips never
found the "thirty-five hundred to five thousand dollars in
cash" in Rose's "upper coat pocket." Phillips then poured gas-
oline on Rose, set him ablaze, and ran him over with his
mother's car after Rose began running around the dark, empty
parking lot to which Phillips had led him, trying to shed his
burning clothes. The majority speculates that Phillips's pur-
pose may not have been to take Rose's and Bartulis's money,
because he did a poor job of searching them and missed the
wad of cash "the size of a cigarette pack" that Rose had in the
breast pocket of his bloody jacket. Many criminals do slip-
shod work, and many robbers are disappointed with the pro-
ceeds, but "I wouldn't have robbed and killed him had I
known that was all I would get," or "I wish I'd searched his

PHILLIPS v. ORNOSKI

other pockets," is not the same as "I did not kill him as part of my robbery."

California law defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."[16] Taking a man's money by killing him fits the definition whether the robbery victim is dead or alive when the killer takes his wallet.[17] If the jury believed Rose, as it plainly did, the only reasonable inference was that Phillips shot and robbed him and Bartulis for their money.

Scratching around for some authority, the majority relies on the distinction drawn in *People v. Green*,[18] between murders occurring during the commission of a robbery and murders where the robbery was incidental to the murder. The distinction is correct, but the majority errs in applying that distinction to Phillips's crimes. In *Green*, the defendant shot his wife in the face with a sawed-off shotgun, killing her, because he thought she was "fooling around" and was going to leave him.[19] He had made her take off her clothes, and he removed the wedding rings from her corpse, took her purse, and got rid of the shotgun.[20] The Court held that he had killed his wife on account of jealousy or as revenge for "snitching," without any purpose of stealing from her, and that he took the clothes, rings, and purse to leave her unidentifiable, not to steal her property.[21] The Court held that the special circumstance did not apply because taking the clothes, rings, and purse "was not in

---

[16]Cal. Penal Code § 211.

[17]*People v. Navarette*, 30 Cal. 4th 458, 499 (2003) ("While it may be true that one cannot rob a person who is already dead when one first arrives on the scene, one can certainly rob a living person by killing that person and then taking his or her property.").

[18]*People v. Green*, 27 Cal. 3d 1 (1980).

[19]*Id.* at 13-14.

[20]*Id.* at 15-16.

[21]*Id.* at 56.

PHILLIPS V. ORNOSKI                    5839

fact a murder in the commission of a robbery but the exact
opposite, a robbery in the commission of a murder."[22] The
robbery aggravator, the Court held, was not a mere matter of
chronology, but a legislative choice to increase the punish-
ment available for criminals "who killed in cold blood to
advance an independent felonious purpose."[23] The Court's
phrasing of the distinction squarely puts Phillips on the wrong
side, because he killed Bartulis in cold blood in order to steal
his money.

The majority cites two other California cases on this issue,
*People v. Abilez*,[24] and *People v. Morris*.[25] In *Abilez*, the
defendant raped his 68-year-old mother anally, strangled her,
and took items of value from her house.[26] He hated his mother
because she gave him up to his aunt to be raised, even though
his mother raised her other nine children.[27] Applying the
*Green* distinction, *Abilez* upheld the robbery special circum-
stance finding. The Court distinguished *Green* because Abilez
had made remarks about needing money, his mother would
not lend him her car or give him money when he asked for it,
she accused him of stealing from her, and he took the car, ste-
reo, and other items from the house after killing her.[28] From
these facts, the Court held, the jury could reasonably infer a
concurrent intent to kill, rob, and sodomize.[29]

In *Morris*, the defendant was a prostitute who solicited gay
men and killed one of his customers. He said the reason he

---

[22]*Id.* at 60.

[23]*Id.* at 61.

[24]*People v. Abilez*, 41 Cal. 4th 472 (2007).

[25]*People v. Morris*, 46 Cal. 3d 1 (1988), overruled on other grounds by
*In re Sassounian*, 9 Cal. 4th 535, 543 n.5 (1995).

[26]*People v. Abilez*, 41 Cal. 4th 472, 483-84 (2007).

[27]*Id.*

[28]*Id.* at 511-12.

[29]*Id.* at 512.

5840                PHILLIPS V. ORNOSKI

killed his customer was that "he had to kill one."[30] The special circumstance was held not to apply because there was insufficient evidence that the defendant had taken anything from the customer when he killed him.[31] There was no robbery, so there was no special circumstance of murdering during the commission of a robbery.

The majority misses the point in *People v Marshall*,[32] a highly relevant California Supreme Court decision applying and expanding upon *Green*. Marshall had raped and murdered a woman, and took a letter from her. The letter was from a grocery store responding to the victim's request for a "check-cashing card," and was of no interest to the murderer. He took the letter as a souvenir of the crime.[33] The reason that the special circumstance did not apply was that there was no evidence that he killed the woman "for the purpose of obtaining the letter."[34] Contrasting Morris's case with one where the special circumstance would apply, the Court explained the *Green* distinction with a hypothetical case in which, under *Green*, the special circumstance would be appropriate. And the hypothetical is the Phillips case, a murderer who takes the victim's wallet:

> If a person commits a murder, and after doing so takes the victim's wallet, the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money. In this case,

---

[30]*People v. Morris*, 46 Cal. 3d 1, 21 (1988), overruled on other grounds by *In re Sassounian*, 9 Cal. 4th 535, 543 n.5 (1995).

[31]*Id.* at 22.

[32]*People v. Marshall*, 15 Cal. 4th 1 (1997).

[33]*Id.* at 12.

[34]*Id.* at 34.

however, the letter taken by defendant was, in the prosecutor's words, an "insignificant piece of paper."[35]

Here, the jury concluded that Phillips committed murder for the purpose of obtaining Rose's and Bartulis's money. Phillips took their wallets, which is where men typically carry their money. Unlike the murderer in *Marshall*, he did not take a worthless memento. The majority comes up with some notions of why Phillips may have shot and robbed Rose and Bartulis for some reason other than to take their money, even though he needed and took the $150 in their wallets. But as the Supreme Court of California has stated, "we need not discern the[ ] various mental states in too fine a fashion; a concurrent intent to kill and to commit an independent felony will support a felony-murder special circumstance."[36] The evidence in this case overwhelmingly supported the conclusion that Phillips possessed the intent to rob these men. He needed the money, he told them to bring it, he shot them, and he took it. The majority's suggestion that had the jury been fully informed of Colman's inducements, it maybe would have concluded otherwise, "is an insult to the jury."[37]

The majority's willingness to disrupt the well-founded decision of the California Supreme Court also disturbs "the State's interest in the finality of convictions that have survived direct review within the state court system."[38] As the United States Supreme Court has stated in overturning similar decisions:

> Finality also enhances the quality of judging. There is perhaps 'nothing more subversive of a judge's

---

[35]*Id.*

[36]*People v. Abilez*, 41 Cal. 4th 472, 560 (2007).

[37]*Thompson v. Calderon*, 120 F.3d 1045, 1073 (9th Cir. 1997) (en banc) (Kleinfeld, J., dissenting), rev'd, *Calderon v. Thompson*, 523 U.S. 538 (1998).

[38]*Calderon v. Thomas*, 523 U.S. 538, 555 (1998).

sense of responsibility, of the inner subjective con-
scientiousness which is so essential a part of the dif-
ficult and subtle art of judging well, than an
indiscriminate acceptance of the notion that all the
shots will always be called by someone else.'[39]

Juries are too likely to impose the death penalty lightly if they
reasonably infer, from decisions like this one, that it will
almost never actually be carried out.

The question the majority addresses seems to be "is there
any conceivable, speculative possibility we can think of that
would make Phillips guilty but without the special circum-
stance?" Whatever the proper standard may be, that is not it.
To determine whether the prosecutor's wrongdoing was prej-
udicial, the most Phillips could demand would be whether
there is "any reasonable likelihood that the false testimony
could have affected the judgment of the jury."[40] The only
answer to the question is "no."

The majority correctly concludes that "[i]t is unimaginable"
that the prosecutor's wrongful conduct could have affected
the first-degree murder guilty verdict. It is likewise unimagin-
able that it could have affected the special circumstance find-
ing. We should affirm.

---

[39]*Id.* (quoting Bator, Finality in Criminal Law and Federal Habeas Cor-
pus for State Prisoners, 76 Harv. L. Rev. 441, 451 (1963)).

[40]*United States v. Agurs*, 427 U.S. 97, 103 (1976).